(No. 22600.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, *vs.* EDWARD J. KELLY, Mayor of the City of Chicago *et al.* Appellees.

*Opinion filed August 23, 1934—Rehearing denied October 11, 1934.*

410

STONE, DeYoung and HERRICK, JJ., dissenting.

THOMAS J. COURTNEY, State's Attorney, WILLIAM J. TUOHY, and JACOB SHAMBERG, (POPPENHUSEN, JOHNSTON, THOMPSON & COLE, FLOYD E. THOMPSON, and ALBERT E. JENNER, JR., of counsel,) for appellant.

WILLIAM H. SEXTON, Corporation Counsel, WINSTON, STRAWN & SHAW, and JOHN L. McINERNEY, (RALPH M. SHAW, WALTER H. JACOBS, and JAMES H. CARTWRIGHT, of counsel,) for appellees.

Mr. JUSTICE ORR delivered the opinion of the court:

*Quo warranto* proceedings were instituted in the circuit court of Cook county to test the constitutionality of the Chicago Park District act and to test the regularity of the election by which it was adopted. The action sought to oust the appellees, Robert J. Dunham, Harry Joseph,

Martin H. Kennelly, B. C. O'Neill and John R. Nash, who had been appointed commissioners of the Chicago Park District by appellee Edward J. Kelly, mayor of Chicago, acting under authority conferred upon him by the act. The circuit court upheld the constitutionality of the act and the regularity of the election and dismissed the information as to all defendants. From that judgment the present appeal was taken.

The facts are stipulated substantially as follows: Under the provisions of the act the question of its adoption was submitted to the electors of the entire area of the new district described, at an election held, pursuant to due notice, on April 10, 1934. The ballots used were in the form provided by the act. No separate election was held in any of the different park districts. The balloting was simultaneous over the entire area of the prospective Chicago Park District, which included twenty-two small and large districts, together with about twelve square miles of "unorganized territory" in Cook county. Of these twenty-two districts, nineteen are commonly referred to as "small park districts" and were organized by petition and referendum pursuant to a general act approved June 24, 1895. The remaining three districts, commonly known as "large park districts," were organized by special acts passed in 1869. Four of the nineteen small park districts, viz., Calumet, Sauganash, West Pullman and North Shore, lay partly within and partly without the city of Chicago, although adjacent and contiguous thereto. The polling places were the ordinary and regular polling places established for all city and county elections, although they were not in each instance located within the limits of the respective park districts, due, principally, to the fact that the balloting was general over the entire area. Within the city of Chicago there were eleven areas not included in any of the twenty-two park districts. The electorate of these eleven areas, including several "split" precincts, also cast ballots on the

question of the adoption of the act. The total vote cast in the entire Chicago Park District on the proposition of adopting the act was 682,486, of which 507,955 voted "yes" and 174,631 voted "no." A majority of the voters in nine park districts, including the three large ones, together with the eleven unorganized areas, voted for the adoption of the act, while a majority in each of fourteen small districts, aggregating about one-fourteenth of the total vote, voted in opposition. On May 1, 1934, the above named commissioners took their required oaths, filed their duly approved bonds and entered upon their official duties. Since that time they have assumed the management and control of all the properties, assets, moneys and records of the twenty-two park districts consolidated within the Chicago Park District. It is agreed by the parties that if the Chicago Park District act, as amended, is valid, and if the election held on April 10, 1934, is valid, then the Chicago Park District is a municipal corporation duly organized and existing under the laws of Illinois and that appellee commissioners were duly appointed and entitled, as such, to hold office.

The People particularly stress the point that the act violates section 13 of article 4 of the State constitution in that the subject is not expressed in its title, which is, "An act in relation to the creation, maintenance, operation and improvement of the Chicago Park District." (Laws of 1933, p. 725.) In this connection it is argued that the title is defective in failing to note the existence or dissolution of the twenty-two other park districts, although the act itself provides how such dissolution shall become effective upon its adoption. The dissolution of the twenty-two scattered park districts followed the adoption of the act by the express terms thereof—one necessarily followed the other. The primary purpose of the act was the creation and operation of one great park system in place of twenty-two smaller and disconnected districts, and the fact that

these smaller units must cease to legally exist after the adoption of the act was only incidental to its chief objective. The title of the act is sufficiently comprehensive, as it not only relates to the "creation" of the new district, but it also has to do with its "maintenance, operation and improvement." Obviously, the Chicago Park District could not maintain, operate and improve the park property within its confines if the twenty-two pre-existing park districts continued to function, as the new and old districts could not have jurisdiction and control at one time of the same territory for the same purpose. (*People* v. *Bowman*, 247 Ill. 276.) The legislature is not only presumed to know the existence of its own legislation respecting the various parks authorized by the act to be consolidated within the Chicago Park District, but it also has power to abolish municipal corporations, with or without the consent of the people, in the locality to be affected. (*Bush* v. *Shipman*, 4 Scam. 186; *County of Richland* v. *County of Lawrence*, 12 Ill. 1; *Trustees of Schools* v. *Tatman*, 13 id. 27; *Wilson* v. *Board of Trustees*, 133 id. 443; *People* v. *Bowman, supra.*) The abolition of the former districts is necessarily the implied result of language used in the title relating to the "creation, maintenance, operation and improvement" of the new and co-extensive Chicago Park District. The provision for dissolution of the existing park districts upon the adoption of the act tends to promote the object and purpose of the act as expressed in the title. *Kasch* v. *Anders*, 318 Ill. 272.

We have examined the various authorities cited by the People in support of their position, particularly *People* v. *Chicago, Burlington and Quincy Railroad Co.* 290 Ill. 327, and *Rouse* v. *Thompson*, 228 id. 522, but cannot apply the same reasoning used to construe the more limited and restricted titles reviewed in these authorities to the broad, general language used in the title here. The title of an

act is not defective because it is broad and general. (*Hagler* v. *Small,* 307 Ill. 460; *People* v. *Hoffman,* 322 id. 174.) It is the general subject, and not the subject matter, that is to be expressed in the title. (*Riggs* v. *Jennings,* 248 Ill. 584; *People* v. *Huff,* 249 id. 164.) The title of an act need not be an abstract synopsis or index of its contents, (*People* v. *McBride,* 234 Ill. 146; *Perkins* v. *Cook County Comrs.* 271 id. 449;) and a title which is sufficient to embrace a particular subject matter of legislation includes by implication matters incidental thereto. (*West Chicago Park Comrs.* v. *Sweet,* 167 Ill. 326; *Boehm* v. *Hertz,* 182 id. 154.) The existence and dissolution of the various districts consolidated into the Chicago Park District was necessarily incidental to the creation and maintenance of the new district, and the title of the act was sufficiently broad in its scope to include by implication such matters as the dissolution of the smaller units. Once the act is adopted such dissolution is an inevitable consequence.

Ineffective is the argument of the People that the use of the term "Chicago Park District" in the title of the act contravenes section 13 of article 4 of the constitution by improperly describing the limits fixed in the body of the act. As previously stated, the new district includes four park districts which are partly within and partly without the city of Chicago, but neither the title nor the body of the act limits the new district to an area exclusively "in Chicago," as was true in the case principally relied upon by the People. (*People* v. *Institute of Protestant Deaconesses,* 71 Ill. 229.) In the absence of any clearly restrictive words, the general term "Chicago," used in connection with "Park District" in the title, is to be regarded as general and descriptive rather than limiting or restrictive in character. This court has often held that section 13 of article 4 of the constitution is to be construed liberally in favor of the validity of an act. *People* v. *Newcom,* 318 Ill. 188, and cases cited.

For many of the same reasons advanced with reference to their first contention, that the subject is not expressed in the title of the act, the People further claim that the title is defective because it "does not express certain subjects under which certain powers are granted the appellees as commissioners," referring particularly to their powers to issue unsold bonds, to levy taxes to pay existing indebtedness and to pay the expenses of holding the election. But, as we above pointed out, the title is general in scope and relates to the "maintenance, operation and improvement," as well as the "creation," of one large park district to supplant numerous smaller ones. The powers expressed in the title imply all incidental authority necessary to enable the new district to operate and make improvements. These functions carry with them the power to levy taxes, to issue bonds, and otherwise, within the provisions of the act, to generally assume the burdens and perform the duties previously imposed upon the twenty-two separate districts. The case cited by the People (*Welch* v. *Post,* 99 Ill. 471,) is not relevant, as there the legislature improperly attempted to authorize municipalities to subscribe to stock of a railroad company and issue bonds therefor, in an act the title of which only purported to amend the charter of a railroad. Outside of the obvious defect in the title, two sets of corporate entities there remained in existence, each separate from the other, while here, under legislative provisions acceptable to the electorate, it was voted to substitute one large park district in lieu of many smaller ones in the same area, and the adoption of one brought about the dissolution of the other.

Another point raised by the People is that the referendum provided for in the act is a delegation of legislative power, in violation of section 1 of article 4 of the constitution. It is agreed that the provisions in the act for a referendum in the area of the Chicago Park District on the question of the creation and organization of the dis-

trict was not an improper delegation of legislative power. The chief attack is directed against that part of the act by which the twenty-two existing park districts were dissolved, it being argued that the separate affirmative vote of each constituent park district is necessary. In this regard the People place reliance on our decision in *People v. Barnett*, 344 Ill. 62, wherein the Women's Jury law was held unconstitutional on the ground that the act left the determination of its becoming a law to the voters of the State and thus constituted a delegation of legislative power. A careful reading of the *Barnett case*, however, will disclose that our holding there is of no aid to the People here and that it is, in fact, authority against their position. The law there held invalid as an improper delegation of legislative power was not a completed law, while no such point can be raised against the act in question here. The narrow rule of separate submission to each park district or locality was not announced in the *Barnett case* or in any other we have been able to find. The particular holding in the *Barnett case* now relied upon by the People is stated in their brief as follows: "Yet it is not regarded that the rule is violated where the legislature passes a statute which is a completed law, affecting or conferring rights upon a restricted locality but to become operative only in the event of an affirmative vote in that locality." No good reason has been advanced, and we are unable to conceive of any reason, why the area of the Chicago Park District is not properly within the definition of a "restricted locality." The act in question has nothing but local application—it applies solely to the area included within the Chicago Park District. It is not within our province to question the wisdom or policy of the legislature in this regard, but its intent and purpose were clear not to submit the question of the adoption of the act separately in twenty-two different park districts but rather to submit it in the entire locality described in the act.

In *Town of Cicero* v. *City of Chicago,* 182 Ill. 301, the matter of detachment of municipal territory was directly involved. We there held: "Townships and incorporated towns are created at the pleasure of the legislature, and they have no vested rights. The legislature have supreme power over them, and may divide or alter them or detach property from them, or even abolish them, at the legislative pleasure, subject only to the restraint of the constitution that the power shall not be exercised by local or special law but shall be by general and uniform law. * * * Such corporations are subject to the legislative control, and may be changed, modified, enlarged or destroyed by general law, to meet the legislative judgment of the public welfare."

The effect of our decision in the *Town of Cicero case* was to permit the detachment of that part of the town of Cicero called "Austin" and its annexation by a referendum participated in by electors residing not only within Austin but over the entire area of Cicero. In other words, electors residing in designated territory outside of Austin were conceded the right to join in a referendum to decide whether Austin could be detached from one locality and annexed to another. In that case the matter of detachment of municipal territory was directly involved, while in the present case, as we have above held, the matter of dissolution of the twenty-two park districts is incidental and follows the adoption of the act as a necessary consequence. In a consolidated school district case (*People* v. *Graham,* 301 Ill. 446,) *quo warranto* proceedings were instituted and a similar point raised that the act there involved was unconstitutional because it provided a method of consolidating districts without the consent of a majority of the voters in each district affected. We there held that while the act of 1919 made a radical departure from previously existing methods for consolidation of school districts and provided for their consolidation without the consent of a majority of the legal voters of each district affected, it was never-

theless constitutional, as the courts are concerned only with the question of legislative power to enact a law and not with the wisdom or justice of such legislation. On these authorities it seems clear that the determination by the legislature to leave the question of the adoption of the Chicago Park District act to a referendum of the voters of the entire area of that district rather than to divide the area into twenty-two separate voting units is not subject to constitutional objection.

Under the provisions of sections 1 and 2 of the Chicago Park District act it is provided that the new district shall be "in succession to all park districts now existing within the territory included within the proposed Chicago Park District," and is to "exercise control over and supervise the operation of all parks, boulevards, ways and other public property now under the jurisdiction of any of said park districts." The People say that by the creation of a new park district comprising all the existing park districts and eleven unorganized areas a local burden has been imposed upon the people of the minority park districts without their consent, in violation of sections 9 and 10 of article 9 of the constitution. They contend that no opportunity was given to the several districts making up the Chicago Park District to consent to the method prescribed in the act for the appointment of their corporate authorities. In effect this argument is largely a repetition of the point previously contended for, that there should have been a separate referendum in each district. The electors in each of the twenty-two districts who participated in the election by which the Chicago Park District act was adopted, by an overwhelming majority approved the mode of appointment of corporate authorities therein provided. The fact that fourteen of the small park districts, by adverse majorities averaging slightly over 500 each, voted against the adoption of the act, of itself confers upon them no rights and imposes upon them no burdens not equally possessed

or imposed upon all the other districts involved. The method of corporate succession provided in the act by the legislature in the exercise of its constitutional power was approved by the electors of the entire area comprising the Chicago Park District, and sections 9 and 10 of article 9 of the constitution were not thereby infringed.

A further objection is urged to section 18 of the act, which authorizes the commissioners of the Chicago Park District "to dispose of authorized and unsold bonds of superseded park districts; to provide for the application of the proceeds thereof and to levy a tax for the payment thereof in the same manner as the commissioners of such superseded districts were empowered so to do." On this point it is claimed the act violates said sections 9 and 10 of the constitution, because it authorizes persons other than the duly elected and appointed corporate authorities of such districts to incur an indebtedness and to levy a tax therein to pay the same. The act affords no basis for this contention, as it does not authorize new commissioners to create a new indebtedness with respect to the unsold bonds in the treasuries of the constituent park districts. In passing this legislation no constitutional safeguards have been violated, and in our opinion a reasonable construction of the act is that the authority granted to the new commissioners respecting the unsold bonds is that such bonds may be issued by them for the sole purpose of funding existing open indebtedness and refunding existing bonded indebtedness, where such open and bonded indebtedness has already been incurred by the respective authorities of the superseded park districts. That this was the legislative intent is further indicated by the fact that at the same session of the legislature at which the Chicago Park District act was passed, authority was granted to several of the then existing park districts to issue bonds for such funding and refunding purposes. (Laws of 1933, pp. 765 *et seq.*) Under this construction the new commissioners will not be

acting as corporate authorities of the superseded districts for the purposes of creating new indebtedness. In such cases they will only be acting as an agency of the State, created pursuant to constitutional authority to take such steps as may be necessary to liquidate existing indebtedness. This would necessarily include the issuance of unsold bonds for funding and refunding purposes, which does not create additional indebtedness.

The record fails to show, as asserted by the People, that persons in those areas lying without the city limits were not given an opportunity to vote for or against appellees as their corporate authorities. This assertion is based largely upon the alleged defective title of the act, which, it is claimed, did not serve as notice to the voters that corporate officers would be chosen with powers to levy taxes and create corporate debts. So far as the title of the act is involved, it has received sufficient consideration earlier in this opinion. The facts as stipulated are that ballots were furnished at polling places within the township of those districts lying partly within and partly without the city of Chicago, where qualified voters could have voted had they so desired. The fact that none of the qualified electors residing within that portion of the Calumet district outside the city of Chicago voted or attempted to vote is of no legal consequence. In the West Pullman Park District area outside the Chicago limits 145 votes were cast, in the Old Portage district outside the city limits 784 ballots were cast, and in the Sauganash district 10 voters outside the city limits cast their ballots. The failure of a few election officials to establish convenient polling places in outlying areas within the area of the new district is not sufficient to invalidate the referendum, especially where it appears that ballots were supplied in each of the election precincts outside the district where qualified electors might have voted.

Objection is urged to section 20 of the act, which provides, in part, as follows: "Such district shall not incur any bonded indebtedness, exclusive of outstanding indebtedness of superseded districts and the amounts of bonds heretofore authorized by or on behalf of any superseded district or districts, to an amount in the aggregate exceeding one and one-half (1½) percentum of the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness." It is contended that this section of the act violates section 12 of article 9 of the constitution. It appears from the record that the total aggregate indebtedness of the twenty-two superseded park districts is such that the exercise by the Chicago Park District of its power to issue bonds to the full amount of one and one-half per cent of the assessed value of the taxable property within the district may create an indebtedness which, when added to that existing in the twenty-two districts, might exceed five per cent of the assessed value of the taxable property within the area of the Chicago Park District. The act affords no basis for the objection mentioned. It is presumed that the legislature was aware of the constitutional limitations of section 12 of article 9. It is obvious, therefore, that the legislature in granting to the Chicago Park District, under section 20, the power to incur indebtedness as provided therein, intended the power to be exercised to the extent, only, that the aggregate of the indebtedness of the Chicago Park District created in its own capacity as a distinct municipal corporation, plus the existing indebtedness of the park districts superseded by it, would not exceed five per cent of the assessed valuation of all taxable property within the territorial limits of the newly created Chicago Park District. Neither the granting of such power nor its exercise is in violation of section 12 of article 9 of the constitution.

Section 2 of the Chicago Park District act was amended March 9, 1934, so as to place the expense of the referendum upon the Chicago Park District if the act were adopted and to place the proportionate expense of the election upon each of the underlying park districts should it be defeated. Other detailed provisions respecting notices of election, polling places and date of election were also included in the amendment. The People urge that the subject of the amendatory act was not within the Governor's proclamation, viz.: "(4) To enact laws and to amend or repeal any existing laws in relation to the form of government, government structure, powers and duties, and the financing of municipal corporations and political subdivisions of the State, including the consolidation thereof and their functions." The law amended on March 9, 1934, was an "existing law," in that it had been enacted by the legislature and approved by the Governor. An act requiring the consent of the majority of legal voters in the district to be affected thereby is specially referred to as a "law" in section 34 of article 4 of the constitution. The law was in existence on March 9, 1934, and then so recognized by the legislature though not in effect until a later date, and it was therefore clearly included within the terms and subject matter of the Governor's proclamation.

A few other points are specified but not argued by the People and will therefore not be considered.

None of the constitutional or other objections raised by the People affect the validity of the act in question. The judgment of the circuit court is therefore affirmed.

*Judgment affirmed.*

Justices Stone, DeYoung and Herrick, dissenting.