(No. 46794.—

JACK HOOGASIAN *et al.,* Appellees, v. REGIONAL TRANSPORTATION AUTHORITY *et al.,* Appellants.

*Announced June 28, 1974.—Opinion filed September 27, 1974.*

Kirkland and Ellis, of Chicago (Don H. Reuben, Lawrence Gunnels, Leo K. Wykell, James C. Munson and Keith McDole, of counsel), for appellant Regional Transportation Authority.

Richard Curry, Corporation Counsel, of Chicago (William R. Quinlan, Daniel Pascale, and Robert Retke, of counsel), for appellants Richard J. Daley, Mayor, and the City Council of Chicago.

Jack Hoogasian, State's Attorney, of Waukegan (Julius Abler, and William C. Marlatt, Jr., Assistant State's Attorneys, of counsel), for appellees.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The Regional Transportation Authority Act (Ill. Rev. Stat., 1973 Supp. (Feb. 1974), ch. 111 2/3, par. 701.01 *et seq.*) providing for a regional transportation authority to furnish public transportation services, facilities and funding in the six northeastern counties of Cook, Du Page, Kane, Lake, McHenry and Will became effective December 12, 1973. Pursuant to that act, a special referendum

election was held in the six affected counties on March 19, 1974, at which a majority of electors properly marking ballots on the proposition voted in favor of creation of the Authority. On May 3 plaintiffs filed this suit for declaratory and injunctive relief against the Regional Transit Authority (RTA) and other defendants on the grounds that the Act and the referendum election were invalid. The Lake County circuit court on June 17 denied the RTA's motion to dismiss and entered a preliminary injunction order restraining defendants from exercising any powers or duties under the Act upon a finding that the referendum ballot was improper. We allowed a direct appeal from those orders pursuant to Supreme Court Rule 302(b) in view of the public importance of the matters presented. That appeal was consolidated with RTA's direct appeal from a subsequent order of the trial court granting a permanent injunction in the same cause. We heard oral argument in late June and announced our judgment shortly thereafter for reasons to be stated in a subsequent opinion. This is that opinion.

Before turning to the specific issues presented for our consideration, we deem it appropriate to briefly review the content and scope of the Regional Transportation Authority Act. The purpose of the Act as stated in section 1.02(b) is "to provide for, aid and assist public transportation in the northeastern area of the State without impairing the overall quality of existing public transportation by providing for the creation of a single authority responsive to the people and elected officials of the area and with the power and competence to provide and facilitate public transportation which is attractive and economical to users, comprehensive, coordinated among its various elements, economical, safe, efficient and co-ordinated with area and State plans." (Ill. Rev. Stat., 1973 Supp., ch. 111 2/3, par. 701.02.) The Act is a comprehensive one, setting forth in detail the RTA's powers and limitations thereof in such matters as purchase, acquisition

and maintenance of facilities; the nature of services to be provided; the level and nature of fares to be charged; coordination and interrelationship of transportation services and programs with State and Federal agencies, other transit authorities and various other governing bodies and units of government; employee welfare and labor relations procedures; finances and the like. In the matter of finances, the RTA is empowered, *inter alia,* to apply for, receive and expend grants, loans and other funds from the State and Federal governments (par. 704.02); to raise revenue for the operation of the authority by the imposition of a tax on persons engaged in the sale of motor fuel, and compensating use tax and a motor vehicle parking tax under certain conditions (par. 704.03); and to issue and sell specified types of negotiable bonds and notes (par. 704.04).

Plaintiffs' initial contention concerns the form of the proposition presented to the voters at the referendum election. Section 1.04 of the Act provides in pertinent part that "A regional transportation authority shall be established upon a favorable vote at the referendum held as provided in Section 1.05 of this Act." (Par. 701.04.) Section 1.05 provides that:

> "A special referendum election shall be held at which there shall be submitted to the electors in the metropolitan region the proposition to approve creation of the Authority, which proposition shall be in substantially the following form:
>
> Shall a Regional Transportation Authority be created for Cook, DuPage, Kane, Lake, McHenry and Will Counties, Illinois?"

The same section goes on to prescribe various details regarding certification of the form of ballot by the State Board of Elections, publication of notice of the referendum election and of the proposition to be voted upon, the counting of ballots and the certification of the election results by the State Board of Elections. The section concludes with the following paragraph:

"The State Board of Elections shall proclaim and certify the results of the referendum election. If a majority of those electors properly marking ballots on the proposition vote in favor of the creation of the Authority, such Authority shall thereby be established."

It is uncontroverted that the proposition appearing on the ballot in the March 19, 1974, referendum election was in the precise language specified by section 1.05 of the Act. Nevertheless, plaintiffs contend that the proposition presented was so vague, indefinite, uncertain, unclear, uninformative and broad as to deprive them of property without due process of law in contravention of the State and Federal constitutions. In this regard, plaintiffs argue that the proposition did not provide the voter with any information as to what he was actually voting for or against, since it did not refer to a specific act to be adopted or rejected or to a particular tax or bond issue for acceptance or rejection. An additional argument is made that the proposition was misleading in that it suggested to the voter that he was being asked to either grant or deny authority to enact legislation creating the RTA whereas in fact the legislature had already enacted legislation on the subject.

In response to these contentions, defendants rely on previous decisions of this court in which we have recognized that when the legislature passes a law with a referendum clause in it and such law prescribes the method by which it is to be submitted to a referendum, that method must be followed. (*E.g., People ex rel. Sandberg v. Grabs* (1940), 373 Ill. 423; *People ex rel. Hudson v. Cleveland, Cincinnati, Chicago and St. Louis Ry. Co.* (1935), 360 Ill. 180; *People ex rel. Brady v. LaSalle Street Trust and Savings Bank* (1915), 269 Ill. 518.) A provision in such a law which specifies the particular form of ballot to be used in a referendum election will normally take precedence over any other statute which would otherwise be applicable but for the special provision. (*People ex rel.*

*Duguay v. New York Central R.R. Co.* (1952), 411 Ill. 584; *Sanders v. Township of Salem* (1944), 385 Ill. 362; *Knappenberger v. Hughes* (1941), 377 Ill. 126.) Defendants also correctly point out that in the absence of any constitutional or statutory mandate to the contrary, it is not necessary that a ballot set forth the details of the proposition to be voted upon or otherwise serve the function of educating voters on its merits. (*People ex rel. Royal v. Cain* (1951), 410 Ill. 39; *Martin v. Hart* (1921), 296 Ill. 149; *People ex rel. Schnackenberg v. Czarnecki* (1912), 256 Ill. 320.) Under those circumstances, a ballot is sufficient if it presents the proposition in such a manner that the voter has a clear opportunity to express his choice either for or against it. (*People ex rel. Black v. Sullivan* (1910), 247 Ill. 176; *People ex rel. Royal v. Cain; Knappenberger v. Hughes.*) As this court stated in *Martin v. Hart* (1921), 296 Ill. 149, at 155: "While the ballot must not contradict the petition [setting forth the details of the proposition to be voted upon] nor permit a vote upon a different question, there is no objection to the generality of a ballot if it directs the attention of the voter to the proposition upon which he is to vote." Indeed, given the complexity of much modern legislative action designed to provide community facilities the operation of which is dependent upon an affirmative vote in the involved geographical area, it is impossible to devise a summary explanation suitable for ballot use which provides the voter with sufficient facts to make an intelligent choice unless he has familiarized himself with the details of the proposition before coming to the polls.

The foregoing authorities do not, however, provide a complete answer to plaintiffs' contentions. The gist of their argument is that the proposition was so completely uninformative and meaningless that the voter had no idea what he was being asked to vote for or against when confronted with the referendum ballot in the polling place. It is argued in addition that publication of the proposition

in advance of the election did nothing to help matters, since the proposition itself in no manner directed the voter either to the Act establishing the Authority or to any other source to which he might look to educate himself on the merits of the proposition prior to the date of the election. In this regard we note that while the Act does provide that the proposition itself be published in advance of the election, it does not prescribe that any additional information be published, and no contention is made that any public notice was in fact given that the proposed regional transportation authority was to be created under the Act which became effective December 12, 1973.

The sufficiency of the proposition cannot be totally divorced from the circumstances in which it was submitted. In that context we are not persuaded that the form of proposition prescribed by the Act was impermissibly vague, meaningless and uninformative. Transportation authorities and mass-transit districts are not such obscure entities that persons of ordinary intelligence have no idea what they are. This is particularly true in the northeastern part of this State where the Chicago Transit Authority and a number of mass-transit districts have been in existence for years. The proposition here in question did in very general terms describe what was to be voted upon; namely, whether or not an authority dealing with the subject of transportation should be established in the six named counties. In our opinion the legislature's decision not to set forth any of the specific details of the Act or summarize its salient features in the proposition did not render it infirm. While plaintiffs appear to concede that a proposition stating "Shall the Regional Transportation Act for Cook, DuPage, Kane, Lake, McHenry or Will Counties, Illinois, be adopted?" would have been sufficient, we see no meaningful distinction between that proposition and the one appearing on the ballot insofar as the information thereby conveyed to the voter is concerned. Viewed realistically, we find it difficult to believe that any voter

could not rather easily ascertain the source to which he might look in advance of the election to obtain whatever information he might desire about the details of the RTA. It was not, in our judgment, essential that the proposition itself make reference to the source of such information. In addition, such shortcomings as there may have been in the informational aspects of the proposition prescribed by the Act can hardly be considered fatal under the particular facts and circumstances surrounding enactment of the RTA Act and the holding of the election pursuant thereto. We take judicial notice of the fact that the question of whether or not a regional transportation authority should be created was a matter which generated an exceptional amount of attention in the involved area due in large part to extensive news-media coverage for a prolonged period from the time the formation of the RTA was first proposed through the referendum election many months later. Viewing matters in this context, we think there is very little possibility that any voter could have been misled by the proposition or that when casting his vote he did not understand what it was he was voting for or against. While plaintiffs argue that *Ashcraft v. Estill County* (Ky. 1956), 290 S.W.2d 31, and *Vincent v. City of Bowling Green* (Ky. 1961), 349 S.W.2d 694, bar attaching any significance to news-media coverage, those cases were concerned with questions of substituting news stories for statutorily required notices and are inapposite here.

Plaintiffs further contend that the referendum election was illegal and void in that the proposition offered in the ballot at the election did not present a law for approval by electors voting on the question as provided in subparagraphs (a) and (b) of section 9 of article IX of the 1970 Constitution. The constitutional provisions in question deal with the subject of State debt. State debt is defined in section 9(a) as "bonds or other evidences of indebtedness which are secured by the full faith and credit of the State or are required to be repaid, directly or indirectly, from

tax revenue and which are incurred by the State, any department, authority, public corporation or quasi-public corporation of the State, any State college or university, or any other public agency created by the State, *but not by units of local government,* or school districts." (Emphasis added.) Section 9(b) then goes on to provide in part that "State debt for specific purposes may be incurred or the payment of State or other debt guaranteed in such amounts as may be provided either in a law passed by the vote of three-fifths of the members elected to each house of the General Assembly or in a law approved by a majority of the electors voting on the question at the next general election following passage." In our opinion the foregoing State debt provisions of section 9 of article IX are not applicable to this case for the reason that no "State debt" is created under the RTA Act. (See *People ex rel. Hanrahan v. Caliendo* (1971), 50 Ill.2d 72.) The establishment of the Authority does not of itself constitute the creation of State debt nor does the Act indirectly do so because of the fact that the RTA is authorized to issue bonds and notes. The Act provides in section 1.04 that "Upon its establishment the authority shall be a unit of local government ***." (Par. 701.04.) As indicated above, section 9(a) of article IX of the Constitution expressly provides that debts incurred by units of local government do not constitute State debt. Furthermore, section 4.04(c) of the Act provides: "All bonds or notes of the Authority issued pursuant to this Section shall be general obligations of the Authority to which shall be pledged the full faith and credit of the Authority ***. *No such bonds or notes shall constitute a debt of the State of Illinois.*" (Par. 704.04(c).) (Emphasis added.) In our opinion, there are no provisions in the Act which contradict the legislative declarations as to the Authority being a unit of local government or the debts created thereby not being considered State debt. In this regard we have given due consideration to section 4.04(e) of the Act, which pro-

vides: "The State of Illinois pledges to and agrees with the holders of the bonds and notes of the Authority issued pursuant to this Section that the State will not limit or alter the rights and powers vested in the Authority by this Act so as to impair the terms of any contract made by the Authority with such holders or in any way impair the rights and remedies of such holders until such bonds and notes, together with interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceedings by or on behalf of such holders, are fully met and discharged. In addition, the State pledges to and agrees with the holders of the bonds and notes of the Authority issued pursuant to this Section that the State will not limit or alter the basis on which State funds are to be paid to the Authority as provided in this Act, or the use of such funds, so as to impair the terms of any such contract. The Authority is authorized to include these pledges and agreements of the State in any contract with the holders of bonds or notes issued pursuant to this Section." The foregoing provisions do nothing more than recognize an already existing obligation on the part of the State to the Authority's note and bond holders not to impair their contractual relationship with the Authority, and clearly do not have the effect of creating "State debt" within the meaning of article IX of the Constitution.

Plaintiffs next argue that the Act improperly delegates legislative authority by permitting the voters to determine whether or not the RTA should be created. In this regard, emphasis is placed on the language in the Act which refers to electors approving "creation" of the Authority which is to be "established" only upon a favorable vote.

Although the power to make laws is vested in the legislature, which may not delegate that power to other bodies, authorities or persons (*People ex rel. Chicago Dryer Co. v. City of Chicago* (1952), 413 Ill. 315; *Sheldon v. Hoyne* (1913), 261 Ill. 222; *Rouse v. Thompson* (1907),

228 Ill. 522), it has long been recognized that the legislature may properly enact a complete law which is to become operative upon the happening of a specified contingency such as the affirmative vote of the people in the area or district to be affected. (*People v. Chicago Transit Authority* (1945), 392 Ill. 77; *People v. Kelly* (1934), 357 Ill. 408; *People ex rel. Thomson v. Barnett* (1931), 344 Ill. 62; *People v. McBride* (1908), 234 Ill. 146; *Home Insurance Co. v. Swigert* (1882), 104 Ill. 653; *Erlinger v. Boneau* (1869), 51 Ill. 94; *People ex rel. Wilson v. Salomon* (1869), 51 Ill. 37.) The above-cited authorities support the conclusion that the RTA Act did not improperly delegate legislative powers to the voters. When the Act became effective on December 12, 1973, all of its terms were fixed and complete with nothing being left to the voters to decide as to the substance of the Act. The one contingency which the legislature determined must be met prior to the time the Authority was to be established and become operative was a favorable vote of the electors in the six northeastern counties to be served by the proposed authority. In this regard, we do not find it constitutionally objectionable that the Act speaks in terms of the RTA being "established" upon a favorable vote of the electors, nor do we concur with plaintiffs' contention that this particular provision either rendered the Act incomplete or constituted a delegation of legislative power to the voter to "create" and "establish" the RTA. It was, of course, the legislature which created and established the RTA upon the happening of the specified contingency. Neither do we perceive any sound reason why the legislature could not choose to "establish" the RTA upon the happening of the specified contingency rather than first establishing the Authority and withholding any powers from it until that contingency occurred.

Plaintiffs also alleged in their complaint that the Act is impermissibly vague and improperly delegates legislative authority by conferring upon the RTA the unfettered right

to levy taxes and to levy and collect fares without any constitutional or statutory guidelines. It is well settled that notwithstanding the rule that the General Assembly cannot delegate its general legislative power to others, it may authorize others to do things which it might properly do but cannot do as understandingly or as advantagiously itself, if the authority thus granted is delimited by intelligible standards. (*Paepcke v. Public Building Com. of Chicago* (1970), 46 Ill.2d 330; *People ex rel. Stamos v. Public Building Com. of Chicago* (1968), 40 Ill.2d 164; *People ex rel. Chicago Dryer Co. v. City of Chicago* (1952), 413 Ill. 315.) The preciseness of the standards required to be set depends on the complexity of the subject matter and the ultimate objective of the act in question. *Board of Education v. Page* (1965), 33 Ill.2d 372.

Turning first to the taxing powers granted to the RTA, the Act specifies in section 4.03 (Ill. Rev. Stat., 1973 Supp., ch. 111 2/3, par. 704.03) that the following taxes may be imposed: (1) Subparagraph (b) permits a "public transportation tax upon all persons engaged in the metropolitan region in the business of selling at retail motor fuel for operation of motor vehicles upon public highways." The tax "shall be at a rate not to exceed five percent of the gross receipts from such sales of motor fuel in the course of such business." (2) Under subparagraph (c), in connection with the foregoing tax, the Authority may also impose a compensating use tax "upon the privilege of using in the metropolitan region motor fuel for the operation of a motor vehicle upon public highways ***." Such tax may not be at a rate in excess of the rate of tax imposed on gross receipts from the sales of motor fuel mentioned above. (3) Subparagraph (d) permits a "motor vehicle parking tax upon the privilege of parking motor vehicles at parking facilities in the metropolitan region." Subparagraph (e) provides that the RTA "may not impose any other taxes except as it may from time to

time be authorized by law to impose." Section 4.04, which deals primarily with the RTA's power to issue bonds, makes it clear that "Nothing in this Act shall be construed to enable the Authority to impose any ad valorem tax on property." The Act also specifies various other matters with regard to the taxing powers granted to the RTA, such as the administrative prerequisites to the imposition of those taxes, requirements concerning conformity with particular existing tax laws, procedures for collection of the tax by the State Department of Revenue and provisions relating to the manner in which collected taxes are to be paid over to the RTA. Although no objection is made by plaintiffs as to the specific type of taxes authorized by the Act, we note that they are substantially the same as those previously upheld by this court. *E.g., Reif v. Barrett* (1933), 355 Ill. 104; *People v. Deep Rock Oil Corp.* (1931), 343 Ill. 388; *Turner v. Wright* (1957), 11 Ill.2d 161; *Jacobs v. City of Chicago* (1973), 53 Ill.2d 421.

With respect to the power to set fares, the Act provides in section 2.04 for a correlation between the level and nature of fares or charges and the nature and standards of public transportation to be provided. The RTA is further directed to provide in certain contracts and agreements "for the terms or cost of transfers or interconnections between different modes of transportation and different public transportation agencies, schedules or routes of such service, changes which may be made in such service, the nature and condition of the facilities used in providing service, the manner of collection and disposition of fares or charges, the records and reports to be kept and made concerning such service and for interchangeable tickets or other coordinated or uniform methods of collection of charges."

In view of the scope of the Act and its intended purposes, we believe it would have been difficult for the legislature to have been more precise in defining the powers of the Authority with respect to taxing and fares.

As to these matters, the Act is not impermissibly vague, nor does it improperly delegate legislative authority.

Likewise, we find no infirmity in the bonding powers granted to the RTA under the Act. Section 4.04(a) provides that the Authority shall have power to borrow money and issue its negotiable bonds or notes therefor for "any and all of the following purposes: to pay costs to the Authority of constructing or acquiring any public transportation facilities (including funds and rights relating thereto, as provided in section 2.05 of this Act); to repay advances to the Authority made for such purposes; to pay other expenses of the Authority incident to or incurred in connection with such construction or acquisition; and to provide funds for any transportation agency to construct or acquire any public transportation facilities, to repay advances made for such purposes, and to pay other expenses incident to or incurred in connection with such construction or acquisition." (Par. 7.04.04.) The RTA is also authorized to issue and deliver its bonds or notes in exchange for any public transportation facilities or in exchange for outstanding bonds or notes of the Authority. The statute describes various other terms and conditions of bonds and notes issued by the Authority including a maximum interest cost of 8% per year; a maximum term of 40 years; and a limitation on issued and outstanding bonds of $500,000,000. Pursuant to section 4.04(c) "All bonds or notes of the Authority *** shall be general obligations of the Authority to which shall be pledged the full faith and credit of the Authority, as provided in this Section. Such bonds or notes shall be secured as provided in the authorizing ordinance, which may include in addition to any other security, a specific pledge of and lien on any or all tax receipts of the Authority and on any or all other revenues or moneys of the Authority from whatever source which may by law be utilized for debt service purposes." From a constitutional viewpoint, we find no infirmity in the bonding-power provisions. The Act

is sufficiently clear and definite as to the RTA's powers and discretion in these matters, and we are of the opinion that the bonding powers prescribed by the Act are valid. *Cf. People ex rel. Ogilvie v. Lewis* (1971), 49 Ill.2d 476.

Plaintiffs advance the further argument that the RTA Act deprives local governmental units of the rights, powers and duties granted to them under sections 10, 11 and 12 of article VII of the Constitution. The applicability of section 11 will be considered later in this opinion, and we direct our attention at this point to sections 10 and 12. Section 10 of article VII contains various provisions authorizing and encouraging units of local government to contract and cooperate with each other as well as with the State, other States and the United States. We find nothing in the RTA Act which is violative of these provisions. To the contrary, the Act contains various provisions relating to the RTA's power to enter into contracts with other transportation agencies, the coordination and interrelationship of services with such agencies, cooperation with planning agencies in the metropolitan area, and a special provision pertaining to agreements with the Chicago Transit Authority. We also note that by separate legislation the General Assembly amended other statutes to specifically provide for intergovernmental cooperation with the RTA; namely, Ill. Rev. Stat., 1973 Supp. (Feb. 1974), ch. 111 2/3, par. 10(b) (Illinois Commerce Commission); Ill. Rev. Stat., 1973 Supp. (Feb. 1974), ch. 111 2/3, par. 309(a) (Metropolitan Transit Authority); Ill. Rev. Stat., 1973 Supp. (Feb. 1974), ch. 111 2/3, par. 355.05 (Local Mass Transit District Act); Ill. Rev. Stat., 1973 Supp. (Feb. 1974), ch. 111 2/3, par. 511.1 (Urban Transportation District Act); Ill. Rev. Stat., 1973 Supp. (Feb. 1974), ch. 24, par. 11—122.2—1 (Illinois Municipal Code—Transportation Systems Division).

Section 12' of article VII of the Constitution provides for the implementation of governmental changes in the following language: "The General Assembly shall provide

by law for the transfer of assets, powers and functions, and for the payment of outstanding debt in connection with the formation, consolidation, merger, division, dissolution and change in the boundaries of units of local government." To the extent that the RTA Act does any of the foregoing matters, it is evident that they have been provided for by law in the RTA Act itself as well as in the separate amendments to the various statutes mentioned above. We find no violation of section 12.

It is also urged that the RTA Act infringes upon the powers and authorities of mass-transit districts such as the Greater Lake County Mass Transit District which have been created pursuant to the Local Mass Transit District Act (Ill. Rev. Stat. 1973, ch. 111 2/3, par. 351 *et seq.*); that the purpose and function of the Greater Lake County Mass Transit District will be altered by the RTA in that its position will change from that of a dominant transportation authority in a definite region to a subordinate authority within a larger region; and that as a consequence of the foregoing, the effect of the RTA Act will be to amend the Local Mass Transit District Act in violation of section 8(d) of article IV of the Constitution, which reads in pertinent part that "A bill expressly amending a law shall set forth completely the sections amended." *Fuehrmeyer v. City of Chicago* (1974), 57 Ill.2d 193, is relied upon to support this contention.

The *Fuehrmeyer* case involved the constitutionality of an act in which the legislature attempted to amend 30 separate statutes simply by referring to their titles. There, the clear purpose of the act in question was to change particular substantive provisions in each of the statutes to which reference was made, thereby altering their present and future scope. Unlike the situation in *Fuehrmeyer,* the RTA Act does not purport to amend the Local Mass Transit District Act by reference or otherwise. Local mass-transit districts created under that Act will continue to be governed by its provisions, which are left intact,

except for the separate amendment to the Act which provides for cooperation with the RTA, as discussed earlier in this opinion. Also, it will be recalled that one of the stated purposes of the RTA Act is to "provide for, aid and assist public transportation in the northeastern area of the State *without impairing the overall quality of existing public transportation* \*\*\*." (Emphasis added.) It may well be that the establishment of the RTA will ultimately have an effect on the programs, plans and policies of units of local government such as the Greater Lake County Mass Transit District. However, we are unable to concur with plaintiffs that this is constitutionally objectionable. It clearly does not constitute an improper attempt to amend a law in violation of section 8(d) of article IV of the Constitution.

It was further asserted in the trial court that the RTA Act altered the "form of government" of the Greater Lake County Mass Transit District in contravention of section 7 of article VII of the Constitution. That section provides for a referendum to "adopt, alter or repeal \*\*\* forms of government provided by law" of "Counties and municipalities which are not home rule units." In our opinion, plaintiffs' reliance on this section is misplaced, since by its terms it applies only to counties and municipalities. The Greater Lake County Mass Transit District formed under the Local Mass Transit District Act is clearly not a county. Nor is it a "municipality," which is defined in section 1 of article VII of the Constitution to mean "cities, villages and incorporated towns."

Plaintiffs also challenge the validity of the method of counting ballots prescribed by the RTA Act. Section 1.05 of the Act (par. 701.05) specifically provides that "Only those ballots properly marked yes or no shall be counted in the referendum" and that the Authority is to be established "If a majority of those electors properly marking ballots on the proposition vote in favor of the creation of the Authority \*\*\*." It is undisputed that the

RTA referendum ballots were tabulated in accordance with the foregoing provisions and that the official tally showed that a majority of voters casting properly marked ballots voted in favor of the proposition. Plaintiffs contend, however, that the prescribed method of counting ballots not only deprives voters of the right to free and equal elections as guaranteed by section 3 of article III of the Constitution but also runs afoul of section 11(b) of article VII of the Constitution, which provides as follows: "Referenda required by this Article shall be held at general elections, except as otherwise provided by law. Questions submitted to referendum shall be adopted if approved by a majority of those voting on the question unless a different requirement is specified in this Article." It is argued that section 11(b) above quoted reflects a constitutional mandate for uniformity in tallying votes in referendum elections and that the constitutional requirement of approval "by a majority of those voting on the question" is not met by a method of counting ballots which eliminates spoiled or improperly marked ballots in computing the number necessary to constitute a majority.

The foregoing arguments advanced by plaintiffs are premised primarily upon the applicability of section 11(b) of article VII of the Constitution to the RTA referendum election. In our opinion, it was not applicable. By its terms, section 11(b) governs referenda "required by this Article." A review of article VII reveals that referendum elections are required in specified instances, including, among others, the changing of county boundaries and county seats (art. VII, sec. 2); the creation or elimination of county offices and the changing of terms of office and manner of selection (art. VII, sec. 4); formation, consolidation and merger of townships (art. VII, sec. 5); and various matters relating to home-rule units (art. VII, sec. 6). It is evident that the establishment of a regional transportation authority pursuant to the RTA Act is not a matter for which referendum is "required" by article VII. The RTA

referendum election was not held pursuant to section 11(b) of article VII, nor was it otherwise subject to its provisions. Accordingly, we need not reach the questions raised by plaintiffs concerning the alleged inconsistencies between the method of counting ballots prescribed in the Act and the provisions of section 11(b) upon which they rely. We note, however, that this court in *People ex rel. Husser v. Hedlund* (1923), 309 Ill. 280, held defective ballots were properly excluded in determining whether "a majority of [those] voting on the proposition" had cast favorable votes, and we note no indication in the proceedings of the 1970 Constitutional Convention of an intent to change that rule. Also, we find no merit in plaintiffs' contentions that the RTA referendum somehow violated the constitutional guarantee of free and equal elections contained in section 3 of article III of the Constitution.

For the reasons above stated, we are of the opinion that the trial court erred in entering the preliminary and permanent injunction orders and in denying the motion to dismiss. Accordingly, the judgments of the trial court are reversed, and the cause is remanded for entry of an order dismissing the complaint.

*Reversed and remanded, with directions.*