SYLVESTER A. BEHRMAN *et al.*, Plaintiffs-Appellants, v. WHITESIDE SCHOOL DISTRICT No. 115, Defendant-Appellee.

Fifth District   No. 5—85—0543

Opinion filed May 6, 1986.

Sam S. Pessin, of Pessin, Baird & Wells, of Belleville, for appellants.

Jim D. Keehner, of Belleville, for appellee.

JUSTICE JONES delivered the opinion of the court:

Plaintiffs, registered and qualified voters in Whiteside School District No. 115, St. Clair County, filed suit to contest the validity of a special election held in that district on February 26, 1985. Two of the three propositions involved in the election dealt with tax-rate increases and were defeated. The third proposition, for the building and equipping of a school addition and issuance of bonds for that purpose, was approved by the voters. In challenging this result the plaintiffs alleged, *inter alia*, that the ballots used in the election failed to conform to statutory requirements in that (1) the back of the ballots did not adequately state the name of the public measures to be voted on and (2) the texture of the paper ballots was such that printing or writing could be seen from the other side. Following a bench trial the trial court ruled for the defendant school district, finding that the propositions were sufficiently named on the back of the ballots as "Proposition [*sic*] 1, 2, and 3 For Rate Increases" and that the paper used for the ballots was in substantial compliance with the statutory requirement. The court additionally found that there was no evidence that any voter was disenfranchised or deprived of his or her right of privacy by use of these ballots. We affirm.

The ballots here at issue were printed on white paper measuring 9½ by 15 inches, so that when folded in quarters and handed to the voters, they measured 4¾ by 7½ inches. On the back of the ballots in the upper right-hand quarter was the endorsement required by statute, including the words "Official Ballot," the designation of the polling place, the date of the election, and a facsimile of the signature of the county clerk. (See Ill. Rev. Stat. 1985, ch. 46, par. 16—3.) Also

appearing in this space were the words, "Proposition [*sic*] 1, 2, and 3 For Rate Increases," designating the public measures to be voted on. (See Ill. Rev. Stat. 1985, ch. 46, par. 16—7.) The proposition to issue bonds for the purpose of building and equipping a school addition was set forth on the front of the ballot as Proposition 1, while propositions to increase the educational-fund tax rate and the building-fund tax rate were set forth as Propositions 2 and 3, respectively.

From the testimony at trial it appeared that all of the ballots were folded in the same way, from bottom to top and then from left to right so that the endorsement was visible on the outside. All of the plaintiffs' witnesses who had voted at the election in question testified that, after voting their ballots, they had refolded them in the same manner as the ballots had been handed to them.

Sylvester Behrman, a plaintiff and voter at the instant election, testified that after voting his ballot and refolding it, he had taken the ballot to an election judge who had "held it up *** and looked at it" before putting it in the ballot box. Behrman stated that the election judge had "had to [look at the ballot] in order to get it back into the box." He stated that although the election official had not opened the ballot, "you [could] read the votes." Behrman had made no comment or objection about the ballot at the time. He had not attempted to fold the ballot further, although no one had told him he could not.

Paul Witt, another voter in the election, testified similarly that after he had voted his ballot and refolded it, an election official had taken it from him and dropped it into the ballot box. He had not seen the election judges do anything dishonest while he was at the polling place. Looking at the reverse side of a sample ballot that had been folded in quarters, Witt stated that he could tell where Proposition 1 was located in the middle of the folded ballot. He could tell which square was for a "yes" vote and which was for a "no" vote, and he would be able to tell which square had been marked if an X were placed in either of them. Witt testified that he had not folded his ballot an additional time after refolding it in quarters because he had not wanted "to do anything different than what [was] customary."

Janet Faughn, a plaintiff, testified likewise that the "main proposition," Proposition 1, was visible through the paper ballot when it was folded in quarters and viewed from the reverse side. She had folded her ballot and put it in the ballot box herself. Faughn testified that she had understood the three propositions contained on the ballot and knew that she could vote any combination of "yeses" or "nos."

Abigail Thomas, a voter and witness for the plaintiff, testified that one could see how Proposition 1 was voted when the ballot was

folded in quarters and viewed from the reverse side, although she had not been concerned about this until after the election results had been determined. She had understood that the three propositions were separate and that she could vote "yes" or "no" on any one or all three of the propositions.

Janice Delaney, county clerk for St. Clair County, testified for the defendant that following the official canvass of votes, Proposition 1 had carried by a 19-vote majority, while Propositions 2 and 3 had been defeated. No one had called her office on the day of the election to complain about the ballots or ask about folding the ballots. Delaney stated that the determination as to how the ballots were folded had been made by her election staff, and she acknowledged that she could probably see how Proposition 1 was voted by looking at the reverse side of a ballot that had been folded in quarters. When the ballot was folded one more time, however, she could not see any of the votes on the ballot. There were no restrictions on folding the ballots, and voters could fold them as many times as they wished.

Delaney testified further that the wording of the propositions on the inside of the ballots had been submitted by the school district but that her election staff had prepared the endorsement for the outside of the ballots, including the designation, "Proposition [sic] 1, 2, and 3 For Rate Increases." Information for the outside of the ballot was normally obtained from the State Board of Elections. It was Delaney's opinion that the voters had had no problem distinguishing between the three propositions because Proposition 1, for the bond issue, had carried while Propositions 2 and 3, for the tax increases, had failed.

Mark Eros, election coordinator for the county clerk's office, testified that paper is graded in pounds, with its opacity varying accordingly. The ballots used in the instant election were printed on 20-pound paper. Referring to a catalog of paper samples ranging from 20 to 140 pounds, Eros testified that no matter what grade of paper is used, printing can be seen through the paper unless it is folded over. Eros determined that printing on a business card was visible through 70-pound paper as well as through 20-pound paper. Eros further produced a sample-ballot-card envelope supplied by the State Board of Elections. The defendant's attorney had written his name and an "X" in the space provided for write-in votes, and Eros testified that this writing was distinguishable from the back of the ballot. Eros, finally, identified three paper ballots that had been used previously in school elections in St. Clair County and stated that, unless the ballots were folded more than once, it was possible to see how the ballots had been

voted from the outside.

On cross-examination Eros stated that although, in the instant election, the bond issue proposition could be seen from the reverse side of the paper ballot, it "would depend on how [the ballot] was folded." If the ballot were folded an additional time or if it were folded in quarters but folded differently (from left to right and then from bottom to top), none of the votes would be visible from the outside.

Carl Solden, an election judge at Whiteside School for the election in question, testified that none of the seven plaintiffs nor Mr. Witt had complained on the day of the election that their ballot was being read or that they could not distinguish between Propositions 1, 2 and 3, nor had any of the plaintiffs asked if they could fold their ballot an additional time. Solden had not looked at any of the ballots handed to him to see how the ballots were voted, and he stated that "if anybody ever looked at [a ballot], it wouldn't be from the back. The judge would have been looking at it from the front to ascertain that the initials were all on there and that all the ballots in our precinct were initialed [before they were put in the ballot box.]"

Ray Mack, superintendent of Whiteside School, testified finally that he had been available on the day of the election but that no one had contacted him to ask questions about the three propositions at issue or about the election in general. He stated that, prior to the election, a public-relations committee from his office had sent out three "major pieces of literature" pertaining to Propositions 1, 2 and 3. This information had been distributed to everyone in the community, first by mail and then by student delivery, and a third mailing had been sent to parents only.

At the conclusion of the evidence the trial court entered judgment for the defendant and against the plaintiffs. The court specifically found that the endorsement on the back of the ballots sufficiently named the propositions. The court additionally found that "the paper used for the ballots was sufficient to provide substantial compliance with the statutory requirement, and there was no evidence that any voter was disenfranchised or deprived of his or her right to privacy."

On appeal the plaintiffs contend that the endorsement on the outside of the ballots identifying the propositions as "Proposition [*sic*] 1, 2, and 3 For Rate Increases" was improper and failed to comply with the statutory requirement for submission of a public question to the electorate (Ill. Rev. Stat. 1985, ch. 46, par. 16—7). Section 16—7 of the Election Code provides in pertinent part:

"The substance of [the public measure to be voted on] shall

be clearly indicated on a separate ballot ***.

*** Any such separate ballot shall be printed on paper of sufficient size so that when folded once it shall be large enough to contain the following words, which shall be printed on the back, 'Ballot for (*name of public measure to be voted on*).' " (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 46, par. 16—7.)

The plaintiffs assert that the endorsement in question merely numbered the propositions rather than naming them and, further, that the description of Proposition 1 as a proposition for rate increases failed to indicate its true character as a proposition to issue bonds for building and equipment purposes. These deficiencies, the plaintiffs contend, represented a substantial departure from the requirements of the statute, rendering the ballots void.

■ We are aware of no other case dealing with the precise issue of what constitutes compliance with the requirement that a public measure be named on the back of a ballot submitting such question to the electorate. It is settled, however, that failure to strictly comply with formal requirements regarding ballots will not necessarily render the ballots void or defeat the election. (*Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 150 N.E.2d 196.) As stated in *Hester*, "a literal compliance with prescribed forms [will] not be required if it appears that the spirit of the law has not been violated and the result of the election has been fairly ascertained" (13 Ill. 2d 481, 485, 150 N.E.2d 196, 199), and, further, "an election will not be defeated by a failure to strictly comply with [requirements of form], providing the irregularity has not hindered or prevented anyone from exercising his right of suffrage and has not affected the merits of the election" (13 Ill. 2d 481, 150 N.E.2d 196, 200). Thus, any defects in naming the propositions here would not render the election void so long as there was substantial compliance with formal requirements so as to effectuate the intent of the statute. See *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 150 N.E.2d 196; see also *Smith v. Calhoun Community School District No. 40* (1959), 16 Ill. 2d 328, 157 N.E.2d 59; *People ex rel. Kramer v. Chicago, Rock Island & Pacific R.R. Co.* (1955), 6 Ill. 2d 266, 128 N.E.2d 710.

■ The statute in question, while requiring that the substance of the public measure be "clearly indicated" on the front of the ballot, provides only that the name of the measure be set forth on the back of the ballot. Courts construing the former requirement regarding the substance of the measure have held that the purpose of this requirement is not to furnish voters with every detail of the measure but to enable them to readily identify the proposition, to know its fundamen-

tals and general effect, and to indicate their individual choice in the matter. (See *Smith v. Calhoun Community School District No. 40* (1959), 16 Ill. 2d 328, 157 N.E.2d 59.) Since, in the instant case, such information as to the substance of the measures was contained on the front of the ballots, the much less rigorous requirement of naming the propositions would seem to be served by wording that put the voters on notice and helped them identify the measures to be voted on. The propositions here were designated by number on the front of the ballots, and the endorsement of "Propositions 1, 2 and 3" thus aided voters in identifying them. In addition, the endorsement put voters on notice that there were three separate propositions, each involving rate increases. We believe, therefore, that the purpose of the statute was served and that the ballots were in substantial compliance with its formal requirements so as to withstand the plaintiffs' allegations of invalidity.

While the plaintiffs are correct, in a highly technical sense, that the proposition for a bond issue, Proposition 1, involved a new tax rather than a tax-rate increase, this proposition would nevertheless result in an increase in the amount of taxes the taxpayers would pay for school purposes. Thus, the endorsement describing Proposition 1 generally as a "rate increase" did not serve to obscure the purpose of the ballot so as to mislead the voters. In any event, it is evident from the results of the election that the voters were able to distinguish readily between the three propositions, as they defeated Propositions 2 and 3 for increases in the educational-fund and building-fund tax rates, while approving Proposition 1 authorizing the issuance of bonds for building and equipping a school addition. The fact, moreover, that there was extensive preelection publicity regarding the three propositions indicates that the voters were informed about the merits of the propositions so as not to be misled by the endorsement in issue. (*Cf. Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117, 317 N.E.2d 534: in context of extensive news-media coverage of election issue, little possibility that voters misled by proposition or failed to understand what they were voting for or against.) Since it appears that, despite the claimed defects in naming the propositions, the election results were fairly ascertained and the voters were not hindered in exercising their rights in the election, we agree with the trial court's finding that the endorsement was sufficient and affirm its ruling in that regard.

The plaintiffs additionally challenge the trial court's finding that there was substantial compliance with the statutory requirement that ballots be printed on paper "through which the printing or writ-

ing cannot be read" (Ill. Rev. Stat. 1985, ch. 46, par. 16—3). As noted by the court in *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 488, 150 N.E.2d 196, 200, "[t]he evident purpose of [this] statutory safeguard is to protect the secrecy of the ballot. To uphold the validity of ballots printed on paper which substantially fails to meet the requirement would defeat this purpose and tend to overthrow the safe conduct of elections."

The ballots in *Hester* were subject to several formal defects, such as failing to designate the polling place or date of election, as well as the more "serious" defects of having been printed on paper through which printing could be read and failing to make provision for write-in votes. The court, while declining to invalidate the ballot on the basis of the former omissions alone, held that "[t]he combination of irregularities present here indicate an infringement of the secrecy of the ballot and the possibility of disfranchisement or fraud, \*\*\* [rendering] the ballots \*\*\* fatally defective in form." *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 488, 150 N.E.2d 196, 201.

In the subsequent decision of *People ex rel. Village of Worth v. Ihde* (1961), 23 Ill. 2d 63, 177 N.E.2d 313, the court reaffirmed the *Hester* rule but held that an election would not be voided on the basis of insufficient paper used in printing the ballots where there was no showing that a voter's franchise had been impaired. Despite the plaintiffs' allegations here that printing could be seen from the outside of the ballots, we find, as did the court in *Worth*, that there was no indication that this affected any voter's decision or the results of the election. It was uncontroverted that printing was visible through any grade or weight of paper, and, although the instant ballots had been folded so that Proposition 1 was on the outside of the ballots when folded, none of the voters had folded his or her ballot an additional time or refolded it so that the proposition would be on the inside of the folded ballot. The voters' failure to fold their ballots further or inquire about doing so demonstrated their lack of concern that their votes might be read, and at least one voter acknowledged that she had not become concerned about this possibility until after the election results had been determined. It appears, therefore, that the alleged deficiency in the quality of paper ballots used, rather than affecting the election results or prejudicing any voter's choice, was raised as an afterthought to challenge the voters' decision to approve Proposition 1 while defeating Propositions 2 and 3. Contrary to the plaintiffs' contentions, moreover, we do not believe that plaintiff Behrman's testimony that an election judge had looked at his ballot "in order to get it into the [ballot] box" was sufficient to show prejudice

voiding the election. We find the plaintiffs' allegations of prejudice stemming from the quality of paper ballots used to be more theoretical than real and, accordingly, affirm the trial court's ruling that the ballots were in substantial compliance with the statute as required for a valid election.

Affirmed.

WELCH and HARRISON, JJ., concur.