2018 IL App (1st) 170834
No. 1-17-0834
Opinion filed March 29, 2018

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PATRICK QUINN, IRENE ROBINSON, CHRISTOPHER BALL, ANTWAIN MILLER, MARC KAPLAN, DANIEL MORALES-DOYLE, and JITU BROWN, | ) ) ), ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 16 CH 13159 |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, THE ILLINOIS STATE BOARD OF EDUCATION, and THE STATE OF ILLINOIS, | ) ) ) ) ) | The Honorable Michael T. Mullen, Judge, presiding. |
| Defendants-Appellees, | ) ) | |
| (Patrick Quinn, Irene Robinson, Antwain Miller, Mark Kaplan, Daniel Morales-Doyle, and Jitu Brown, Plaintiffs-Appellants). | ) ) ) ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     In this appeal, plaintiffs, who are all Chicago residents, ask us to find unconstitutional

section 34-3 of the School Code (105 ILCS 5/34-3 (West 2016)). Plaintiffs claim this statute

is unconstitutional because it denies Chicago residents the ability to vote for members of

their school board, while residents of all other Illinois school districts may do so.[1] Plaintiffs argue that section 34-3, which permits the mayor of Chicago to appoint the members instead, violates our state constitution's guarantee of "free and equal" elections. Ill. Const. 1970, art. III, § 3 ("All elections shall be free and equal.").

¶ 2        In this appeal, plaintiffs attack a longstanding law that has been on the books for decades.

¶ 3        As plaintiffs allege in their complaint, since 1872, when the Chicago Board of Education was first created, the mayor of the City of Chicago has appointed its members. In 1988, the General Assembly passed a law that gave Chicago citizens more input into the selection process and also included council approval of the mayor's ultimate selections. *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 94 (1990). However, the 1988 law was declared unconstitutional by our supreme court just two years later. *Fumarolo*, 142 Ill. 2d at 100 ("the entire Act must be declared unconstitutional"). In 1995, the state legislature eliminated the requirement of city council approval. 105 ILCS 5/34-3(b) (West 2016) ("No appointment to membership on the Chicago Board of Education that is made by the Mayor under this subsection shall require the approval of the City Council."). Now, over 20 years later, plaintiffs challenge this change and seek direct election of board members by the registered voters in the City of Chicago, which has never occurred since the Chicago School Board was created almost 150 years ago.[2]

¶ 4        This appeal is one of three challenges to the mayor's authority to appoint the members of the Chicago School Board.

___

[1]On appeal, plaintiffs describe the nature of their action as a suit "to require an election."

[2]Plaintiffs' brief to this court forthrightly admits that "there has never been a right to vote for the Chicago Board of Education."

¶ 5        First, on October 5, 2016, these same plaintiffs filed a complaint in federal district court, which challenged section 34-3 of the School Code under various federal statutes and federal constitutional provisions. *Quinn v. Board of Education of the City of Chicago*, 234 F. Supp. 3d 922, 928, 933, 934 (discussing federal equal protection clause (U.S. Const., amend. XIV) and Voting Rights Act (52 U.S.C. § 10101 (2012)), federal due process (U.S. Const., amend. XIV), and Civil Rights Act of 1964 (42 U.S.C. § 1983 (2012) respectively). The federal district court dismissed the complaint with prejudice on February 13, 2017 (*Quinn*, 234 F. Supp. 3d at 936), and plaintiffs appealed to the Seventh Circuit Court of Appeals. The federal appeal has been pending for a year, and no opinion has been issued.

¶ 6        Second, also on October 5, 2016, plaintiffs filed this complaint, which the circuit court of Cook County dismissed on February 27, 2017, and which is the subject of this appeal.

¶ 7        Third, a bill was introduced in the Illinois General Assembly on February 1, 2017, which would provide substantially all the relief plaintiffs are seeking here. 100th Ill. Gen. Assem., House Bill 1774, 2017 Sess., § 5 (amending 10 ILCS 5/2A-1.2(d) to provide that, as of the year 2023, "members of the Chicago Board of Education shall be elected in a nonpartisan election"). The bill provides that "the City of Chicago shall be subdivided into 20 electoral districts by the General Assembly," with each district represented by one member and one additional member elected at large to serve as president of the Chicago school board. 100th Ill. Gen. Assem., House Bill 1774, 2017 Sess., § 10 (amending 105 ILCS 5/34-3(b-5)). The bill passed both the House of Representatives and the Senate in May 2017. The last reported action taken on the bill was a referral on September 28, 2017, by the House to the rules committee.

¶ 8     Although the complaints filed in both federal and state courts made race-based allegations (*Quinn*, 234 F. Supp. 3d at 934), the same cannot be said of the appeals. Plaintiffs have stated explicitly in their brief to this court and during oral argument that they are not raising any race-related claims in this court.[3]

¶ 9     Although city council approval was eliminated in 1995 when Mayor Richard M. Daley began his third term as mayor, plaintiffs chose not to sue until over 20 years later. However, whether or not this suit is politically motivated does not affect the purely legal question presented to this court, which is whether the appointment, by the mayor, violates the free and equal election clause of our state's constitution. Ill. Const. 1970, art. III, § 3 ("All elections shall be free and equal.").

¶ 10    In addition, we are not here to decide "the wisdom or unwisdom" of the legislature's choice of mayoral selection. "[T]he wisdom or unwisdom of legislative action in determining the means to be adopted to resolve an existing social problem is not for the judiciary to decide. Legislation will be upheld unless it is in violation of some constitutional limitation." *Fumarolo*, 142 Ill. 2d at 62-63. Thus, the sole question for us is the constitutionality of the School Code provision.

¶ 11    For the following reasons, we do not find plaintiffs' arguments persuasive, and thus we cannot find the statute unconstitutional.

---

[3]Plaintiffs' appellate brief states: "plaintiffs have not brought a race claim." See *Hearne v. Board of Education of the City of Chicago*, 185 F.3d 770, 776 (7th Cir. 1999) ("there is nothing here to indicate that the Illinois General Assembly structured the Chicago school reform legislation [of 1995] specifically because it wanted to disadvantage African Americans").

¶ 12                                    BACKGROUND

¶ 13                                   I. The Parties

¶ 14            On October 5, 2016, seven plaintiffs filed a complaint in the circuit court of Cook County against the Board of Education of the City of Chicago (Chicago School Board) and the Illinois State Board of Education and State of Illinois (state defendants). As explained below, only the state defendants filed a response brief in this appeal, and only six of the seven plaintiffs filed a notice of appeal. Christopher Ball, who was one of the original seven plaintiffs, was not named in the notice of appeal.

¶ 15            The lead plaintiff, Patrick Quinn, is the former governor of Illinois. The complaint in the case at bar alleges that all seven plaintiffs are Chicago residents and registered voters. The complaint further alleges (1) that four of the seven plaintiffs, namely, Antwain Miller, Daniel Morales-Doyle, Jitu Brown, and Christopher Ball, are "Chicago Public Schools parent[s]"; (2) that two of the seven plaintiffs, namely, Irene Robinson and Marc Kaplan, are "Chicago Public Schools grandparent[s]"; (3) that three of the seven plaintiffs, namely, Patrick Quinn, Daniel Morales-Doyle, and Jim Brown are Chicago property owners; and (4) that four of the plaintiffs, namely, Patrick Quinn, Irene Robinson, Marc Kaplan, Daniel Morales-Doyle, are current or former members of local Chicago school councils.

¶ 16            Defendant Chicago School Board is a school district in the State of Illinois. As to the State defendants, the Illinois State Board of Education is primarily responsible for administering the School Code, a portion of which is challenged in this appeal (and quoted in the next section), and the State of Illinois is responsible for adhering to its constitution, which requires elections to be free and equal. Ill. Const. 1970, art. III, § 3 ("All elections shall be free and equal.").

¶ 17                                    II. The Statute at Issue

¶ 18        The complaint in the case at bar sets forth several grounds for finding section 34-3 of

the School Code (105 ILCS 5/34-3 (West 2016)) unconstitutional under our state

constitution. Since this statute is the crux of this lawsuit, we provide it here in full. Section

34-3 states in full:

        "(a) Within 30 days after the effective date of this amendatory Act of 1995, the

        terms of all members of the Chicago Board of Education holding office on that date

        are abolished and the Mayor shall appoint, without the consent or approval of the City

        Council, a 5 member Chicago School Reform Board of Trustees which shall take

        office upon the appointment of the fifth member. The Chicago School Reform Board

        of Trustees and its members shall serve until, and the terms of all members of the

        Chicago School Reform Board of Trustees shall expire on, June 30, 1999 or upon the

        appointment of a new Chicago Board of Education as provided in subsection (b),

        whichever is later. Any vacancy in the membership of the Trustees shall be filled

        through appointment by the Mayor, without the consent or approval of the City

        Council, for the unexpired term. One of the members appointed by the Mayor to the

        Trustees shall be designated by the Mayor to serve as President of the Trustees. The

        Mayor shall appoint a full-time, compensated chief executive officer, and his or her

        compensation as such chief executive officer shall be determined by the Mayor. The

        Mayor, at his or her discretion, may appoint the President to serve simultaneously as

        the chief executive officer.

        (b) Within 30 days before the expiration of the terms of the members of the

        Chicago Reform Board of Trustees as provided in subsection (a), a new Chicago

Board of Education consisting of 7 members shall be appointed by the Mayor to take office on the later of July 1, 1999 or the appointment of the seventh member. Three of the members initially so appointed under this subsection shall serve for terms ending June 30, 2002, 4 of the members initially so appointed under this subsection shall serve for terms ending June 30, 2003, and each member initially so appointed shall continue to hold office until his or her successor is appointed and qualified. Thereafter at the expiration of the term of any member a successor shall be appointed by the Mayor and shall hold office for a term of 4 years, from July 1 of the year in which the term commences and until a successor is appointed and qualified. Any vacancy in the membership of the Chicago Board of Education shall be filled through appointment by the Mayor for the unexpired term. *No appointment to membership on the Chicago Board of Education that is made by the Mayor under this subsection shall require the approval of the City Council*, whether the appointment is made for a full term or to fill a vacancy for an unexpired term on the Board. The board shall elect annually from its number a president and vice-president, in such manner and at such time as the board determines by its rules. The officers so elected shall each perform the duties imposed upon their respective office by the rules of the board, provided that (i) the president shall preside at meetings of the board and vote as any other member but have no power of veto, and (ii) the vice president shall perform the duties of the president if that office is vacant or the president is absent or unable to act. The secretary of the Board shall be selected by the Board and shall be an employee of the Board rather than a member of the Board, notwithstanding subsection (d) of Section 34-3.3. The duties of the secretary shall be imposed by the rules of the Board.

(c) [The board] may appoint a student to the board to serve in an advisory capacity. The student member shall serve for a term as determined by the board. The board may not grant the student member any voting privileges, but shall consider the student member as an advisor. The student member may not participate in or attend any executive session of the board." (Emphasis added.) 105 ILCS 5/34-3 (West 2016).

¶ 19    Section 34-3 of the School Code was amended in 2005 to add the last subsection, subsection (c), which is not at issue in this appeal. Pub. Act 94-231, § 5 (eff. July 14, 2005).

¶ 20                                    III. The Counts

¶ 21    The complaint in the case at bar, namely, the complaint filed in state court, alleged grounds only under our state's constitution.

¶ 22    The complaint alleged three counts: (1) denial of the right to vote pursuant to article I, section 2 of the Illinois Constitution (Ill. Const. 1970, art. I, § 2 ("No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws.")) and article III, section 2 of the Illinois Constitution (Ill. Const. 1970, art. III, § 3 ("All elections shall be free and equal.")); (2) denial of due process under article I, section 2 of the Illinois Constitution (Ill. Const. 1970, art.I, § 2)[4] by the continued enforcement of section 34-3 of the School Code and by levying property taxes on plaintiffs and other Chicago taxpayers, thereby depriving them of the right to taxation approved by elected representatives; and (3) violation of home rule autonomy by adopting section 34-3 of

---

[4]In their appellate brief, plaintiffs also make brief claims concerning other constitutional guarantees. Ill. Const. 1970, art. III, § 4 ("[E]lections shall be general and uniform."); Ill. Const. 1970, art. IX, § 1 ("The General Assembly has the exclusive power to raise revenue *** as limited or otherwise provided in this Constitution."). However, plaintiff may not add new claims for relief on appeal. *Mabry v. Village of Glenwood*, 2015 IL App (1st) 140356, ¶ 15.

the School Code without holding a referendum as allegedly required by article VII, section 6(f) of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6(f)) ("A home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum *or as otherwise authorized by law*.") (Emphasis added.).

¶ 23        Plaintiffs' appellate brief states that "[p]laintiffs appeal only from the dismissal of Counts I and II."

¶ 24        For relief, both these counts seek a declaration that section 34-3 of the School Code is unconstitutional, as well as preliminary and permanent injunctive relief. The injunctive relief requested in these two counts includes:(1) "ordering the defendants to confer with the Chicago Board of Elections to develop a plan for holding elections for a [new] Board of Education" and (2) "allow[ing] defendants to continue to collect such taxation on the condition that in the interim the General Assembly will put in place or substitute by law an elected school board or other minimum of legislative accountability."

¶ 25        IV. Factual Allegations

¶ 26        The complaint makes the following factual allegations.

¶ 27        The complaint alleges that the first Chicago School Board was created in 1872 by the Illinois General Assembly. For over 100 years, from 1872 until 1988, the mayor appointed its members, with "the advice and consent of the City Council." Thus, as alleged by plaintiffs, there has never been, in the history of Chicago, the type of direct elections that plaintiffs seek in this appeal.[5]

---

[5]See *Fumarolo*, 142 Ill. 2d at 96 ("Prior to the [1988] Act, the mayor had complete discretion in appointing the board of education, subject only to the city council's approval.").

¶ 28     The complaint also alleges that, at the time of its creation, the Chicago School Board was "accountable to the City Council *** for tax and expenditure decisions." However, in 1980, "the General Assembly placed the financial management of the Chicago public schools under the Chicago Finance Authority."

¶ 29     The complaint alleges that in 1988[6] the General Assembly passed the Chicago School Reform Act of 1988 (1988 Act), which created a 28-member Chicago School Board nominating commission. Five members of the nominating commission were appointed by the mayor. The remaining 23 members were parent and community representatives from local school councils. The 1988 Act also created local school councils, elected by Chicago citizens, which had the authority to appoint and remove principals.[7]

¶ 30     The complaint alleged that the nominating commission provided the mayor with a slate of three candidates to fill each vacant position on the Chicago School Board and that his selection had to be approved by the City Council. The complaint alleged that Mayor Richard M. Daley "refused on a number of occasions to appoint any of the nominees" of the nominating commission.

¶ 31     The complaint does not allege, but we may take judicial notice of the fact, that our supreme court declared the entire 1988 Act unconstitutional in *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 100 (1990).[8]

---

[6]*Fumarolo*, 142 Ill. 2d at 130 (Clark, J., dissenting) ("In November 1987, United States Secretary of Education William Bennett labeled the Chicago public schools the 'worst in the nation.' ").

[7]*Fumarolo*, 142 Ill. 2d at 96 (the purpose of the 1988 Act was "to give greater authority at the local school level and to remove much of the centralized authority").

[8]Concerning the 1988 Act, our supreme court observed: "[T]here does not appear to be a comparable statute in the United States or a comparable public education structure." *Fumarolo*, 142 Ill. 2d at 83.

¶ 32      The complaint alleges that in 1995 the General Assembly passed the Chicago School Reform Amendatory Act (1995 Act), which eliminated the local school council's role in appointing board members, eliminated the nominating commission, and returned to the mayor the right to select the Chicago School Board. Pub. Act 89-0015 (eff. May 30, 1995). Under the 1995 Act, the City Council no longer confirmed the mayor's selections.

¶ 33      The complaint alleges that, in the 20 or more years since the 1995 Act, the Chicago public school system is on the verge of bankruptcy, the teacher's pension plan went from being fully funded to being only 52% funded in 2015, and the Chicago public school system operated at a deficit in fiscal year 2016.

¶ 34      The complaint also alleges: "Based on national data of big city school districts, the composition of a school board—that is, whether appointed or elected—has no correlation to academic achievement."

¶ 35      The complaint alleges that corruption in the school system is so severe that its chief executive officer (CEO) was facing a federal prison sentence. See Timothy McLaughlin, *Former Chicago Public School Chief Sentenced for Fraud*, (Apr. 28, 2017, 5:21 PM), https://www.reuters.com/article/us-chicago-education-fraud/former-chicago-public-schools-chief-sentenced-for-fraud-idUSKBN17U31I (last visited Mar. 13, 2018) (a federal judge sentenced the former CEO of the Chicago school system to 4½ years in prison for her role in a scheme to steer contracts to a prior employer in exchange for kickbacks and bribes).

¶ 36      As discussed more fully below, since defendants filed motions to dismiss within the time allowed for a responsive pleading, there was no answer filed in response to this complaint.

¶ 37                                   V. Procedural History

¶ 38          On November 7, 2016, the Chicago School Board and the state defendants jointly

filed a motion to extend the deadline to answer or otherwise plead, which the trial court

granted on November 14, 2016. The trial court's order stated that plaintiffs had advised the

court of their "intent to seek preliminary relief in advance of the April 4, 2017 election." The

court ordered defendants to answer or otherwise plead by December 19, 2016.

¶ 39          As they had advised the court, plaintiffs moved on November 30, 2016, for a

preliminary injunction to "requir[e] defendants to draft procedures for an election of the

Board of Education while this suit is pending in order to allow for an election on April 4,

2017." In the alternative, plaintiffs sought a permanent injunction. On December 9, 2016, the

trial court entered an order setting a briefing schedule.

¶ 40          On December 19, 2016, the Chicago School Board filed a combined motion to

dismiss (735 ILCS 5/2-619.1 (West 2016)), seeking dismissal (1) pursuant to section 2-615

of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)) for failure to state a cause of

action, and (2) pursuant to section 2-619 (735 ILCS 5/2-619 (West 2016)) for lack of

standing. The motion claimed that plaintiffs lacked standing because, since they had no right

to vote for members of the Chicago School Board, they had no injury. The Chicago School

Board also filed a separate response to plaintiffs' motion for a preliminary injunction.

¶ 41          On December 19, 2016, the state defendants filed their own combined motion to

dismiss, seeking dismissal pursuant to sections 2-615 and 2-619. The state defendants sought

a section 2-619 dismissal on the ground of sovereign immunity rather than standing. The

state defendants' dismissal motion was combined with their response to plaintiffs' motion for

preliminary relief.

¶ 42    On January 6, 2017, plaintiffs filed a combined response to defendants' motion and reply in support of their motion for preliminary relief. On January 17, 2017, the Chicago School Board and the state defendants each filed a reply.

¶ 43                           VI. The Trial Court's Ruling

¶ 44    On February 27, 2016, the trial court held a hearing, in which it declined to hear argument on plaintiffs' motion for a preliminary injunction, until it had first decided defendants' dismissal motions. Defendants informed the trial court that the federal district court had already ruled in their favor in the companion federal case (*Quinn*, 234 F. Supp. 3d at 936), and they asked the trial court to consider the federal order as additional authority.

¶ 45    The trial court found, first, that plaintiffs had standing. The court next ruled that the rational basis test applied, rather than the strict scrutiny test, to determine constitutionality, explaining: "When classifications are based upon geographical or population criteria, they do not involve inherently suspect classes and are generally subject to a rational-basis review." In addition, the court observed that there was no fundamental right to elect an administrative review body, such as a school board. Thus, the court applied the rational basis test.

¶ 46    Applying the rational basis test, the trial court found that "[m]any courts, including the Illinois Supreme Court *** have all concluded that the particular needs of the districts justifies a population-based legislative classification." Thus, the court found that section 34-3 of the School Code did not violate either the right to equal protection or the right to equal elections as guaranteed by the Illinois Constitution, and it dismissed count I pursuant to section 2-615 of the Code of Civil Procedure.

¶ 47    Turning to count II, which concerned taxation, the trial court observed that "[t]he statute establishes a statutory cap upon the tax rate," that "any increases in annual rates must

13

be submitted to the voters pursuant to Section 34-53,"[9] and that "the Board is accountable to Chicago residents and taxpayers for all of its actions through the Mayor, who is elected and/or potentially not re-elected, if the Mayor fails to carry out the citizens' mandate." For all these reasons, the trial court found no due process violation and dismissed count II pursuant to section 2-615 of the Code of Civil Procedure.

¶ 48     Turning to count III concerning home rule authority, the trial court summarized plaintiff's argument as "a referendum was required to determine if the citizens of Chicago consented to this [1995] change." The trial court dismissed this count pursuant to section 2-615 of the Code of Civil Procedure, stating: "Plaintiffs might have a case if the City enacted this legislation, but it did not. The Legislature enacted Section 34-3; therefore, no referendum was required."

¶ 49     On February 27, 2017, the trial court entered an order that stated in full:

"This matter coming to be heard on Defendants' 2-619.1 motions to dismiss and Plaintiffs' motion for a preliminary injunction; all parties having been heard; a transcript for proceedings having been taken; and the Court being fully advised in the premises, IT IS HEREBY ORDERED:

(1) Defendants' motions pursuant to Section 2-615 are granted;

(2) Defendants' motions pursuant to Section 2-619 are denied as moot;

(3) Plaintiffs' motion for a preliminary injunction is DENIED as moot; and

(4) Plaintiffs' complaint is dismissed with prejudice."

---

[9]Section 34-53 of the School Code (105 ILCS 5/34-53 (West 2016)) was amended twice after the trial court's February 27, 2016, ruling, in order (1) to permit the Chicago School Board to levy an additional tax to be paid, "as soon as possible after collection, directly to Public School Teachers' Pension and Retirement Fund of Chicago and not to the Board of Education" (Pub. Act 99-521, § 10 (eff. June 1, 2017)); and (2) to increase the allowable rate for this tax from 0.383% to 0.567% (Pub. Act 100-465, § 965 (eff. Aug. 31, 2017)).

¶ 50                                              VII. Appeal

¶ 51          On March 29, 2017, six of the seven original plaintiffs filed a timely notice of appeal on the thirtieth day after the dismissal.

¶ 52          In the appellate court, the state defendants and the Chicago School Board jointly filed three motions for extensions of time to file their briefs, which were all granted by this court. On November 30, 2017, this court granted defendants' third request, permitting them to file their briefs by December 19, 2017, but ordered that no further extensions would be allowed. On December 19, 2017, the Attorney General of the State of Illinois filed an appellees' brief on behalf of the state defendants alone. See also *Stroger v. Regional Transportation Authority*, 201 Ill. 2d 508, 511 (2002) (the Attorney General may "intervene for the purpose of defending the constitutionality" of an Illinois statute); Ill. S. Ct. R. 19 (eff. Sept. 1, 2006) (requiring service of notice on the Attorney General when the constitutionality of a statute is challenged). The Chicago School Board chose not to file an appellee's brief with this court.

¶ 53                                              ANALYSIS

¶ 54          This appeal is about the constitutionality of section 34-3 of the School Code. 105 ILCS 5/34-3 (West 2016).

¶ 55          On appeal, plaintiffs raise only two claims: first, that they, as Chicago residents, have a fundamental right to directly elect school board members, since citizens of all other Illinois school districts have this ability; and second, that the Illinois General Assembly may not delegate the power to tax to a board that is not elected. For the following reasons, we do not find these claims persuasive.

¶ 56                                    I. Standard of Review

¶ 57        In the case at bar, the trial court dismissed the complaint for failure to state a claim, pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)).

¶ 58        The rules governing our review in this appeal are well established. A section 2-615 motion attacks the legal sufficiency of the complaint. *Tyrka v. Glenview Ridge Condominium Ass'n*, 2014 IL App (1st) 132762, ¶ 33 (citing *DeHart v. DeHart*, 2013 IL 114137, ¶ 18). When ruling on a section 2-615 motion, a court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inference that may be drawn from those facts. *Tyrka*, 2014 IL App (1st) 132762, ¶ 33 (citing *DeHart*, 2013 IL 114137, ¶ 18). A trial court should dismiss a count or a cause of action under section 2-615 only if it is readily apparent from the pleadings that there is no possible set of facts that would entitle plaintiffs to the requested relief. *Tyrka*, 2014 IL App (1st) 132762, ¶ 33 (citing *DeHart*, 2013 IL 114137, ¶ 18). The question for the court is whether the allegations of the complaint, when construed in the light most favorable to the plaintiffs, are sufficient to establish the cause of action. *Tyrka*, 2014 IL App (1st) 132762, ¶ 33 (citing *DeHart*, 2013 IL 114137, ¶ 18).

¶ 59        However, Illinois is also a fact-pleading jurisdiction, and as a result, plaintiffs are required to allege sufficient facts to bring a claim within a legally recognized cause of action. *Tyrka*, 2014 IL App (1st) 132762, ¶ 34 (citing *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429-30 (2006)). Although plaintiffs are not required to set forth evidence in a complaint, they also cannot simply set forth conclusions. *Tyrka*, 2014 IL App (1st) 132762, ¶ 34 (citing *Marshall*, 222 Ill. 2d at 430). Mere conclusory allegations unsupported by specific facts do not suffice. *Tyrka*, 2014 IL App (1st) 132762, ¶ 34 (citing *Primax Recoveries, Inc. v. Atherton*, 365 Ill. App. 3d 1007, 1010 (2006)).

¶ 60 On appeal, our review of a trial court's section 2-615 dismissal is *de novo*. *Tyrka*, 2014 IL App (1st) 132762, ¶ 35 (citing *DeHart*, 2013 IL 114137, ¶ 18). In addition, *de novo* review is appropriate because the resolution of this appeal turns on the interpretation of a clause of the Illinois Constitution, which is purely a question of law. *Hooker v. Illinois State Board of Elections*, 2016 IL 121077, ¶ 21.

¶ 61 *De novo* review means that we perform the same analysis that a trial judge would perform. *Guvenoz v. Target Corp.*, 2015 IL App (1st) 133940, ¶ 41. Since our review is *de novo*, we may consider any basis appearing in the record. *Guvenoz*, 2015 IL App (1st) 133940, ¶ 41. We may also affirm on any basis appearing in the record, whether or not the trial court relied on that basis and whether or not the trial court's original reasoning was correct. *HBLC, Inc. v. Egan*, 2016 IL App (1st) 143922, ¶ 25; *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 62       II. Constitutional Issues as a Last Resort

¶ 63 Our supreme court has "repeatedly" instructed the appellate court to reach constitutional issues "only as a last resort." *E.g. In re E.H.*, 224 Il. 2d 172 (2006) (citing over 10 supreme court opinions making this point); see also *East St. Louis Federation of Teachers, Local 1220, American Federation of Teachers, AFL-CIO v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 408 (1997) ("A court should avoid declaring legislation unconstitutional if the case does not require it [citation], and the power to determine the constitutionality of a statute should only be exercised if such finding is essential to the disposition of a case.").

¶ 64 However, in this appeal, the complaint raises only constitutional grounds, and the parties make only constitutional arguments. Before the trial court, defendants raised issues

concerning standing and sovereign immunity, but they do not raise these issues before us. *People v. Givens*, 237 Ill. 2d 311, 323 (2010) (an appellate court should generally not search the record for unargued and unbriefed claims to reverse a trial court's judgment). Thus, we turn to the constitutional issues before us. In doing so, we keep in mind Illinois Supreme Court Rule 18, which requires a court to provide more detail in its opinions when constitutional issues are involved. Ill. S. Ct. R. 18 (eff. Sept. 1, 2006).

¶ 65                                    III. Rules of Statutory and Constitutional Interpretation

¶ 66             This appeal requires us to interpret and apply clauses of our state constitution.

¶ 67             "In the absence of a supreme court pronouncement on the issue, we turn to the plain language of the Illinois Constitution, which is the best guide to the document's interpretation." *Jones v. City of Calumet City*, 2017 IL App (1st) 170236, ¶ 25 (citing *Cincinnati Insurance Co. v. Chapman*, 181 Ill. 2d 65, 77 (1998)).

¶ 68             "[W]e apply the same general principles to construe both statutory and constitutional provisions." *Hooker*, 2016 IL 121077, ¶ 35. "When construing a constitutional provision, our primary purpose is to effectuate ' "the common understanding of the persons who adopted it—the citizens of this state".' " *Hooker*, 2016 IL 121077, ¶ 35 (quoting *Walker v. McGuire*, 2015 IL 117138, ¶ 16, quoting *Kanerva v. Weems*, 2014 IL 115811, ¶ 36). "If the language of the provision is unambiguous, we must give it effect without resorting to aids of statutory construction." *Hooker*, 2016 IL 121077, ¶ 35. "Only if the provision is ambiguous will we 'consult the drafting history of the provision, including the debates of the delegates to the constitutional convention.' " *Hooker*, 2016 IL 121077, ¶ 35 (quoting *Walker*, 2015 IL 117138, ¶ 16). In addition, " '[o]ne contending that language should not be given its natural meaning understandably has the burden of showing why it should not.' " *Hooker*, 2016 IL

121077, ¶ 35 (quoting *Coalition for Political Honesty v. State Board of Elections*, 65 Ill. 2d 453, 464 (1976)).

¶ 69    Plaintiffs have the burden of establishing that section 34-3 of the School Code is unconsitutional. "Parties who wish to challenge the constitutionality of a statute bear the burden of rebutting the presumption [of constitutionality] and establishing a constitutional violation." *East St. Louis*, 178 Ill. 2d at 412; *Tully v. Edgar*, 171 Ill. 2d 297, 304 (1996) ("a presumption of constitutionality"). When reviewing plaintiffs' constitutional claims, we begin with the presumption that the statute is constitutional, and we interpret it in a way that renders the statute constitutional, if we "can do so reasonably." *East St. Louis*, 178 Ill. 2d at 412.

¶ 70    As stated above, we will interpret the statutory section at issue the same way we do a constitutional provision and with the same primary rule: to ascertain and give effect to the individuals who passed it—who are, in the case of a statute, the legislators. *East St. Louis*, 178 Ill. 2d at 411-12; *Fumarolo*, 142 Ill. 2d at 96 (the "fundamental" rule is "to ascertain and give effect to the intent of the legislature"). As with a constitutional provision, we will construe the intent of the legislators primarily from the language of the statute itself, and we will evaluate the statute as a whole. *East St. Louis*, 178 Ill. 2d at 411-12. Legislative intent is ascertained by considering "the entire Act, its nature, its object and the consequences" of "construing it one way or the other." *Fumarolo*, 142 Ill. 2d at 96.

¶ 71                    IV. Rational Basis or Strict Scrutiny

¶ 72    Plaintiffs argue that the right to an equal vote is a fundamental constitutional right, and thus the strict scrutiny test applies. By contrast, defendants argue that there is no fundamental right to vote for school board members and thus the rational basis test applies.

¶ 73        Courts examining the constitutional validity of a statute will ordinarily apply the rational basis test. *Stroger*, 201 Ill. 2d at 516-17; *Tully*, 171 Ill. 2d at 304. Under this test, a court will uphold a statute if (1) it bears a rational relationship to a legitimate legislative purpose and (2) it is not arbitrary or discriminatory. *Stroger*, 201 Ill. 2d at 517; *Tully*, 171 Ill. 2d at 304; *Fumarolo*, 142 Ill. 2d at 74.

¶ 74        However, when the challenged statute impinges upon a fundamental constitutional right, then a court applies strict scrutiny. *Stroger*, 201 Ill. 2d at 517; *Tully*, 171 Ill. 2d at 304; *Fumarolo*, 142 Ill. 2d at 74. Under strict scrutiny, a court will find the statute constitutional only if (1) the means employed by the legislature to achieve the stated goal were necessary to advance a compelling state interest and (2) the statute is narrowly tailored to achieve that goal. *Stroger*, 201 Ill. 2d at 517; *Tully*, 171 Ill. 2d at 304-05; *Fumarolo*, 142 Ill. 2d at 73. A statute is narrowly tailored if it uses the least restrictive means to achieve the stated legislative goal. *Stroger*, 201 Ill. 2d at 517; *Tully*, 171 Ill. 2d at 305; *Fumarolo*, 142 Ill. 2d at 73.

¶ 75                    V. Not a Fundamental Right

¶ 76        Two propositions are equally true in relation to this question. First, if an election is held, then an Illinois citizen has a free and equal right to vote in it. That right has been described as follows: " '[W]hen a public office must be filled by election, *** the method used shall be reasonably designed to achieve the objective that the "vote of any citizen is approximately equal in weight to that of any other citizen in the State." ' "*Stroger*, 201 Ill. 2d at 517 (quoting *Eastern v. Canty*, 75 Ill. 2d 566, 577-78 (1979) ,quoting *Reynolds v. Sims*, 377 U.S. 533, 579 (1964)). This principle has often been described as the one-person, one-vote doctrine and concerns the equality of votes in an existing election. *Stroger*, 201 Ill. 2d at

517; *Fumarolo*, 142 Ill. 2d at 73 (the one-person, one-vote rule forbids having "votes of unequal weight" in any given election). Thus, when a public office must be filled by election, an Illinois citizen has a fundamental right to an equal vote in it. *Stroger*, 201 Ill. 2d at 517; see also *Tully*, 171 Ill. 2d at 308 (when the people have chosen their representative in a valid election, an act interfering with the result "implicates the fundamental right to vote").

¶ 77    A second, and equally true, proposition is that an election does not always have to be held to fill a public office. Both the United States Supreme Court and the Illinois Supreme Court have long "recognized the constitutionality of filling offices by appointment, rather than election." *Stroger*, 201 Ill. 2d at 518 (discussing U.S. Supreme Court cases); *East St. Louis*, 178 Ill. 2d at 413 (a school board is "subject to the will of the legislature," which has the discretion to formulate a board's character); *Tully*, 171 Ill. 2d at 312 ("The legislature could certainly provide that, upon the expiration of the terms of office of the currently elected trustees, successor trustees will be appointed rather than elected.").

¶ 78    The second proposition may render the first proposition irrelevant in certain instances. As our supreme court has explained, "where a body is appointed and not elected, there need not be compliance with the one person, one vote rule." *Fumarolo*, 142 Ill. 2d at 98.[10]

¶ 79    In sum, plaintiffs are not claiming that they lack the right to an equal vote in an existing election but rather that an election must be created for them to vote in. Plaintiffs claim that, if most Illinois residents have the ability to directly elect their school boards, then

---

[10]See also *Fumarolo*, 142 Ill. 2d at 114 (Ryan, J., concurring) ("*if* the governing group of the entity created by the legislature is *to be elected*, then the 'one man, one vote' rule applies" (emphases added)).

Chicago residents should have a direct election too.[11] In contrast, defendants argue that a direct election is not required and appointment by an elected representative is constitutionally permissible.

¶ 80    What is at stake here is not a right to vote but the right to have a court order an election. The issue here is whether this public office must be filled by election. See *Stroger*, 201 Ill. 2d at 517. Decades ago, our supreme court answered this question in the negative, stating "no resident of a school district has an inherent right of franchise insofar as school [board] elections are concerned." (Internal quotation marks omitted.) *Latham v. Board of Education of the City of Chicago*, 31 Ill. 2d 178, 186 (1964); see also *Spaulding v. Illinois Community College Board*, 64 Ill. 2d 449, 456 (1976) (under the 1970 Constitution, as under the 1870 Constitution, "[n]o resident of a school district" has "an inherent right of franchise" to "school elections").

¶ 81    The free and equal election clause provides: "All elections shall be free and equal." Ill. Const. 1970, art. III, § 3. Section 3 is identical to article II, section 18 of the 1870 Constitution, which was in effect when the mayorally appointed Chicago School Board was first created. Ill. Const. 1870, art. II, § 18 ("All elections shall be free and equal.").[12] The clause does not state that elections must be held. It states that "all elections" that are held must be "free and equal."

---

[11]According to the United States Census Bureau, 21%, or roughly one-fifth, of Illinois residents live in Chicago. United States Census Bureau, *Quick Facts: Chicago City, Illinois* (https://www.census.gov/quickfacts/fact/table/chicagocityillinois/PST045216) (last visited Mar. 14, 2018) (population estimate of Chicago, as of July 1, 2016, was 2,704,958); United States Census Bureau, *Quick Facts: Illinois* (https://www.census.gov/quickfacts/IL) (last visited Mar. 14, 2018) (population estimate of Illinois, as of July 1, 2016, was 12,801,539).

[12]The 1870 Constitution specifically delegated to the General Assembly the power to establish a "system of free schools." Ill. Const. 1870, art. VIII, § 1 ("[t]he General Assembly shall provide a thorough and efficient system of free schools").

¶ 82    In support of their argument that the ability to elect a school board implicates a fundamental right, plaintiffs cite in support three cases that all involved the election of school officials: (1) *Fumarolo*, 142 Ill. 2d at 100, in which the supreme court found unconstitutional the prior version of the statute in front of us; (2) *East St. Louis*, 178 Ill. 2d at 415, 422, in which the supreme court found that the right to vote was *not* implicated by a statute permitting the removal of an elected school board; and (3) *Tully*, 171 Ill. 2d at 303-04, in which the supreme court found that the legislature's decision to change a university board of trustees from elected to appointed was constitutional. However, all three cases involved existing elections and whether the right to vote in an existing election was impinged. None of those cases involved the threshold issue before us, which is whether this " 'public office' " requires an election (*Stroger*, 201 Ill. 2d at 517 (quoting *Eastern*, 75 Ill. 2d at 577-78)) and whether this court should order an election to be held for this office for the first time in the history of Chicago.

¶ 83    Since we must interpret a document as a whole, we turn to other provisions in our constitution to see if they clarify this issue. *City of Chicago v. Soludczyk*, 2017 IL App (1st) 162449, ¶ 21 (a consideration of the "overall structure" is "helpful" to place individual provisions "in context"). Section 8 of article VII of the Illinois Constitution, which governs local government, specifically provides that "school districts *** shall have only powers granted by law" and that "[t]he General Assembly shall provide by law for the selection of officers" of school districts. Ill. Const. 1970, art. VII, § 8. Section 8 does not in any way limit the General Assembly's power to provide "for the selection" of school district officers. Ill. Const. 1970, art. VII, § 8. The subsequent use of the word "selected" in article X, which governs education, sheds light on the meaning of the word "selection" in article VII. Section

23

2 of article X creates a State Board of Education, and specifies that its members may be "elected or selected."[13] Ill. Const. 1970, art. X, § 2. Since both words are used, the word "selected" must mean something different or more than simply "elected"; otherwise the use of both words would be superfluous. Our constitution thus specifically approves the selection, by a means in addition to and other than election, of "school district[ ]" "officers" Ill. Const. 1970, art. VII, § 8.

¶ 84        Probably in light of the above constitutional provisions, plaintiffs do not argue that a statewide ban on all school board elections would be unconstitutional.[14] They explain that the reason that they are attacking the 1995 Act is that it eliminated city council approval, which they claim provided more direct voter control than mayoral approval alone. As a result, what they are attacking is the means by which the General Assembly chose to accomplish voter input, in essence, arguing that the means chosen by the General Assembly—mayoral approval—is not closely enough tied to voter approval, whereas—in their opinion—council approval was. Thus, the issue, as they frame it, is one of whether the means, of mayoral approval, is rationally related to voter approval. This question is a question of rational basis, not a fundamental right. As our supreme court has previously found, "the wisdom or unwisdom of legislative action in determining the means to be adopted to resolve an existing social problem is not for the judiciary to decide." *Fumarolo*, 142 Ill. 2d at 62-63.

¶ 85        Plaintiffs argue that treating Chicago differently violates our constitution. However, our constitution provides for differing rules for Cook County, in which Chicago is located, with respect to county boards, county officers, and home rule units (Ill. Const. 1970, art. VII,

---

[13]Section 2 provides that the "manner of election *or* selection shall be provided by law." (Emphasis added.) Ill. Const. 1970, art. X, § 2.

[14]See *Hearne*, 185 F.3d at 774 ("the Illinois statute books are riddled with laws that treat communities with more than 500,000 residents—*i.e.,* Chicago—differently from smaller ones").

§§ 3(c), 4(b), 6(f)), thereby recognizing the uniqueness of our state's most populous city and the need for differing rules to govern it. This is similar to the state of New York and New York City, where although most school districts in New York state are controlled by elected school boards, the New York City school system is not. *Running for the School Board*, N.Y. State School Boards Ass'n, http://www.nyssba.org/about-nyssba/running-for-the-school-board/ (last visited Mar. 14, 2018) ("Except for those in Yonkers and New York City, board members are elected."). In New York City, the school system has been under the control of the mayor since 2002. *Mayoral Control of New York City Public Schools Extended 2 Years*, Eyewitness News ABC7NY, (June 29, 2017), http://abc7ny.com/education/mayoral-control-of-nyc-public-schools-extended-2-years/2164249/ (last visited Mar. 14, 2018). As our supreme court has previously observed, "most large cities," like New York and Chicago, have "serious problems in [their] public school system." *Fumarolo*, 142 Ill. 2d at 61.

¶ 86    All these reasons lead us to conclude that the rational basis test applies, to the detriment of plaintiffs, and the cases cited by plaintiffs do not persuade us otherwise.

¶ 87    First, in *East St. Louis*, our supreme court held that the right to vote was *not* implicated by a statute that permitted the removal of an entire, elected school board (*East St. Louis*, 178 Ill. 2d at 422) and that the statute was *not* subject to strict scrutiny (*East St. Louis*, 178 Ill. 2d at 413). *East St. Louis* involved a state statute that permitted a financial oversight panel to remove an entire elected school board if the board failed to follow the panel's orders. *East St. Louis*, 178 Ill. 2d at 412. In holding that voters had no right to object, our supreme court explained that a school board is "subject to the will of the legislature." *East St. Louis*, 178 Ill. 2d at 413. "The legislature has the discretion to formulate the character, function, and duties of school boards." *East St. Louis*, 178 Ill. 2d at 413-14. That discretion

included the ability to enact, prior to the board's election, a statute that also permitted their removal in certain circumstances. *East St. Louis*, 178 Ill. 2d at 414.[15]

¶ 88    The *East St. Louis* opinion does not support plaintiff's case; it undermines it. In *East St. Louis*, as in the case at bar, the school board was "subject to the will of the legislature," which determined that it should be appointed rather than elected. See *East St. Louis*, 178 Ill. 2d at 413. As in *East St. Louis*, the legislature exercised its "discretion to formulate the character, function, and duties" of the school board and determined that it should be appointed. *East St. Louis*, 178 Ill. 2d at 413-14. If the General Assembly is permitted to enact a statute that authorizes the removal of an entire elected school board, how can we say that it is prohibited from choosing not to authorize an election in the first place?

¶ 89    The *East St. Louis* opinion also found that the plaintiffs' equal protection claims had no merit. The *East St. Louis* plaintiffs had alleged that the statute at issue "violate[d] equal protection because it treats the voters of financially troubled school districts differently from voters living in financially stable districts." *East St. Louis*, 178 Ill. 2d at 422. This claim is similar to plaintiffs' claim here, in that plaintiffs claim that Chicago voters are being treated differently than voters in other districts, and plaintiffs' complaint makes allegations about the financial difficulties of Chicago schools. The *East St. Louis* opinion rejected this type of claim, observing that the East St. Louis school district at issue was not being treated differently from any other district that was "similarly situated." *East St. Louis*, 178 Ill. 2d at 423. The court found that what happened with other financially stable school districts was completely "immaterial, because those districts are not similarly situated." *East St. Louis*,

---

[15]Our supreme court held that while the statute was facially constitutional, it was unconstitutional as applied to the existing school board members because they had a property interest in their continued employment (*East St. Louis*, 178 Ill. 2d at 418) and they did not receive prior notice and a pretermination hearing as due process required (*East St. Louis*, 178 Ill. 2d at 421-22).

178 Ill. 2d at 423. In evaluating whether a district was "similarly situated," the court employed the legislature's distinction between "financially troubled" and "financially stable" districts. *East St. Louis*, 178 Ill. 2d at 422. Similarly, in the case at bar, the legislature has concluded that no other district is "similarly situated" to Chicago. *East St. Louis*, 178 Ill. 2d at 423. Plaintiffs have alleged no facts showing that Chicago is like any other district in the state. Where, as in this case, plaintiffs have removed any race claims from this appeal, we cannot find that the policy decision by the legislature, about who is and who is not similarly situated, violates equal protection.[16]

¶ 90    Second, the *Tully* case also does not support plaintiffs' argument for applying strict scrutiny. In *Tully*, as in the case at bar, the legislature passed an act providing that certain offices would be appointed rather than elected. *Tully*, 171 Ill. 2d at 303-04, 313. Specifically, the statute in *Tully* provided that the nine elected trustees of the University of Illinois would be replaced by trustees appointed by the governor. *Tully*, 171 Ill. 2d at 304. Our supreme court found that the legislature's decision to change the board of trustees from elected to appointed positions was constitutional. *Tully*, 171 Ill. 2d at 313.[17] The court did not apply strict scrutiny to this question and found merely that this part of the act "satisfie[d] its apparent objective." *Tully*, 171 Ill. 2d at 313.

¶ 91    The court found unconstitutional only "the provision removing the elected trustees from office midterm." *Tully*, 171 Ill. 2d at 313. The court explained that this part of the act implicated the right to vote because it nullified the votes already cast in a previously held and

---

[16]*Fumarolo*, 142 Ill. 2d at 71 (the protections offered by the free and equal clause and the equal protection clause of our state constitution "are in effect those of the equal protection clause of the fourteenth amendment").

[17]See also *Tully*, 171 Ill. 2d at 312 ("The legislature could certainly provide that, upon the expiration of the terms of office of the currently elected trustees, successor trustees will be appointed rather than elected.").

valid election. *Tully*, 171 Ill. 2d at 307; *East St. Louis*, 178 Ill. 2d at 414 (discussing *Tully*). Since it voided the effect of an already held election, that part of the act merited strict scrutiny, which the Act did not pass. *Tully*, 171 Ill. 2d at 309. "When the people have chosen their representatives in a valid election, legislation that nullifies the people's choice by eliminating the right of the elected official to serve implicates the fundamental right to vote." *Tully*, 171 Ill. 2d at 308.

¶ 92    Unlike the unconstitutional provision in *Tully*, the act in the case at bar did not nullify the result of a previously held election because no election was required. Similar to the constitutional provision in *Tully*, it was the result of the legislature's constitutional decision to make an office appointed rather than elected, which selection is subject only to the rational basis test. See also *Stroger*, 201 Ill. 2d at 518 ("no constitutional reason exist[s] why state or local officers of a nonlegislative character may not be chosen by appointment, rather than through election").

¶ 93    Third, in *Fumarolo*, our supreme court found unconstitutional the 1988 Act, which was the predecessor to the 1995 Act at issue before us. *Fumarolo*, 142 Ill. 2d at 100. The 1988 Act created local school councils that were elected, and in the council elections, the votes of parents were weighted more heavily than the votes of other citizens. *Fumarolo*, 142 Ill. 2d at 63, 90. Explaining why strict scrutiny was necessary, our supreme court stated: "Absent a showing that an *elected* body serves a special limited purpose, a restriction which operates to dilute a citizen's vote must meet a strict scrutiny test of justification." *Fumarolo*, 142 Ill. 2d at 89-90. In other words, when a statute dilutes a citizen's vote in an existing election for "an elected body," strict scrutiny applies. *Fumarolo*, 142 Ill. 2d at 89-90.

¶ 94    However, the supreme court found that appointment of the Chicago School Board—the question before us—created "no constitutional question." *Fumarolo*, 142 Ill. 2d at 95. In the 1988 Act under review in *Fumarolo*, local school councils elected members to subdistrict councils, which, in turn, elected members to a school board nominating commission, which presented candidates to the mayor, who then selected from among these candidates for the Chicago School Board. *Fumarolo*, 142 Ill. 2d at 64, 94. The court found that, since the election of the local school councils was unconstitutional, so was the process for selecting the Chicago School Board. *Fumarolo*, 142 Ill. 2d at 99. However, the court explained that "no constitutional question" would arise if "the mayor and city council, who represent all residents" had "complete discretion in selecting the members of the board." *Fumarolo*, 142 Ill. 2d at 95. Similarly, in the case at bar, since the mayor, "who represent[s] all residents," has "complete discretion in selecting the members of the board," there is no constitutional question here. *Fumarolo*, 142 Ill. 2d at 95. Like the other two cases cited by plaintiffs, *Fumarolo* also does not support their argument for strict scrutiny. See also *Stroger*, 201 Ill. 2d at 522 (applying the rational basis test to determine the constitutionality of the appointment process for RTA directors).

¶ 95    Plaintiffs claim that the case at bar is different because, here, there is no city council approval, and the city council is more directly tied to the voters than the mayor. We fail to see how the council is more directly tied to the voters than the mayor when they are both elected by the voters.[18] In addition, this is more a question of the means chosen by the

---

[18]*Quinn*, 234 F. Supp. 3d at 934 (considering the same issue under the federal due process clause, the federal district court in the companion federal action could find "no persuasive reason to distinguish, for due process purposes, between taxation by a Board accountable to the City Council and taxation by a Board accountable to the mayor"); *Stroger*, 201 Ill. 2d at 513, 522 (where the county commissioners authorized to appoint 4 RTA directors were themselves "constitutionally elected," the appointments did "not abridge plaintiffs' fundamental constitutional right to vote," even though only the suburban

legislature than whether there is a fundamental right. Nowhere does the constitution provide a fundamental right to council approval as opposed to mayoral approval. In *Fumarolo*, our supreme court found that, "where the State chooses to select members of an official body by proper appointment rather than by election, the fact that each official does not ' "represent" the same number of people does not deny those people equal protection of the laws.' " *Fumarolo*, 142 Ill. 2d at 98-99 (quoting *Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50, 58 (1970)). Similarly, in the case at bar, the fact that each council member represents a smaller number of people than the mayor does not deny these people equal protection of the laws when the mayor selects. Thus, we do not find this argument persuasive.

¶ 96                                          VI. Rational Basis

¶ 97        For the reasons explained above, we apply the rational basis test, which is the test that courts ordinarily apply when determining the constitutional validity of a statute. *Stroger*, 201 Ill. 2d at 516-17; *Tully*, 171 Ill. 2d at 304; see also *Hearne*, 185 F.3d at 774 ("the proper test under the Equal Protection Clause for [a] geographical discrimination argument is whether the legislature had a rational basis for devising a separate [school] system for Chicago").

¶ 98        We can think of a number of reasons[19] why the General Assembly had a rational basis for treating Chicago differently.[20] With a city as large as Chicago, if school board

---

commissioners were allowed to appoint and the Mayor appointed the 4 RTA directors on behalf of Chicago).

[19]*Spaulding*, 64 Ill. 2d at 457 (after listing possible reasons that could constitute a rational basis, the supreme court remarked: "The legislature in its wisdom *may* have considered these and other differences sufficient to warrant the classification for the purpose of different treatment. *** As long as these substantial differences exist and bear a rational relationship to the subject of the legislation, the classification is not violative of equal protection.") (emphasis added).

members are elected from different neighborhoods, the result could be a balkanization of the school system, with members worrying more about the individual district that elected them rather than the city as a whole. Wealthy neighborhoods might be resistant to an allocation of resources to where they are most needed. Mayoral control makes it easier to implement wholesale changes or a reallocation of resources across neighborhood lines, because the mayor is obliged to look at the city as a whole. With the quantity of moving parts in a big city, it may be difficult for voters to know exactly who is to blame if things are not working. With the board appointed by the mayor, it is easy to know who to blame—the mayor—and voters may show any displeasure they may have at the polls, every four years.

¶ 99    Plaintiffs' complaint makes no claims, whatsoever, that the academic performance of students in Chicago declined in the two decades since 1995, when the mayor assumed exclusive control over the board, as compared to prior years. See *Fumarolo*, 142 Ill. 2d at 90 ("education is a compelling State interest"); Ill. Const. 1970, art. X, § 1 ("[a] fundamental goal of the People of the State is the educational development of all persons"). In fact, plaintiffs' complaint alleges that there is no correlation at all between academic achievement and whether a school board is appointed or elected. Plaintiffs' appellate brief concedes that "student outcomes at Chicago Public Schools have improved recently according to some measures." If these two statements are true, then this court cannot call the legislature's choice irrational. We are not saying that this is, or is not, the best plan, but we do not have to decide that question. Whether it is or is not the best possible plan, it is certainly not irrational, and plaintiffs do not argue that it is. See *Stroger*, 201 Ill. 2d at 523 (in finding that the RTA

---

[20]*Cf. Tully*, 171 Ill. 2d at 311 ("There is some evidence in the record that the legislature determined that the quality of the Board of Trustees [of the University of Illinois] would be higher if the trustees were appointed, rather than elected.").

appointment process passed the rational basis test, the court observed that it was the legislature's job "to balance the varying interests of the diverse region to be served by the RTA").

¶ 100     On this same issue, our supreme court has previously found:

"[T]his court takes judicial notice that the problems inherent in the supervision and management of a school system in a metropolitan area of 500,000 or more, and particularly, in the city of Chicago, are far more complex and may well require different modes of operation than a system in an average-size district. The intricacies of a metropolitan school district of this magnitude require an especially high degree of competence in the members of the Board. The legislature has determined that such personnel can best be obtained as Board members in large cities having a population of over 500,000 by the appointive process rather than by a general city election, and has so provided ***. Whether or not the General Assembly has chosen the best method to accomplish an objective is a legislative and not a judicial question." *Latham*, 31 Ill. 2d at 184.[21]

¶ 101     Thus, we cannot find section 34-3 of the School Code (105 ILCS 5/34-3 (West 2016) unconstitutional.

¶ 102                                     VII. Taxation

¶ 103     Plaintiffs' second claim is that the Illinois General Assembly may not delegate the power to tax to a board that is not elected and that such a delegation violates due process. Their appellate brief argues: "What plaintiffs contend is that it is unconstitutional to have

---

[21]See also *Hearne*, 185 F.3d at 774-75 ("With respect to public schools, it was entirely rational for the [Illinois] legislature to believe that the logistics of running a school system designed to serve" the number of students enrolled in Chicago was "far different from those implicated in systems serving less than a tenth of that number").

taxation without *any* representation through a legislative body, directly or indirectly." For the following reasons, we do not find plaintiffs' taxation claim persuasive.

¶ 104    Plaintiffs argue that, in 1995, the legislature removed any check on the Board's ability to tax, except for a cap of 4% (105 ILCS 5/34-53 (West 2016)), and "[t]hat cap—set long ago in 1995—is arbitrary in light of the changed conditions today," particularly "the financial crisis that the Board now faces but did not face at the time."

¶ 105    However, in 2016 and again in 2017, the legislature increased the amount that the Chicago School Board could levy, in light of the financial problems that the board was facing. In 2016, the General Assembly authorized the Chicago School Board to "levy annually, upon all taxable property located within the district, a[n additional] tax at a rate not to exceed 0.383%." Pub. Act 99-521, § 10 (eff. June 1, 2017) (amending 105 ILCS 5/34-53). Then again in 2017, the General Assembly increased this additional tax from 0.383% to 0.567%, stating: "Beginning with the 2017 taxable year, for the purpose of making an employer contribution to the Public School Teachers' Pension and Retirement Fund of Chicago, the board may levy annually, upon all taxable property within the district, a tax at a rate not to exceed 0.567%." Pub. Act 100-465, § 965 (eff. Aug. 31, 2017) (amending 105 ILCS 5/34-53).

¶ 106    These amendments show that the Chicago School Board's taxing authority is under the scrutiny and control of a legislative body, namely, our state legislature. The factual premise of plaintiffs' claim, that the state legislature has not considered the Chicago School Board's taxing authority in twenty years, is simply not accurate. Plaintiff's claim of "taxation without *any* representation through a legislative body, directly or indirectly" is similarly not

accurate. There is representation through a legislative body, namely, the state legislature who regulates the tax levy rates.

¶ 107    The 4% cap which plaintiffs consider inadequate[22] is contained in section 34-53 of the School Code and states: "The maximum rate for educational purposes shall not exceed 4.00%." 105 ILCS 5/34-53 (West 2016). By contrast, the taxes that were just authorized, also by section 34-53, state that they are "for the purpose of making an employer contribution" to the pension fund, rather than for educational purposes. Pub. Act 100-465, § 965 (eff. Aug. 31, 2017) (amending 105 ILCS 5/34-53).

¶ 108    To the extent that plaintiffs are claiming that the 4% cap on educational purposes set by the legislature is arbitrary and unrelated to present needs,[23] the legislature could have changed that cap, if it saw fit, when it amended the same exact statutory section—twice in the last two years. A policy decision about the appropriate taxing level for a particular school board is better left to the legislature, not the courts. *Fumarolo*, 142 Ill. 2d at 62-63 ("the wisdom or unwisdom of legislative action in determining the means to be adopted to resolve an existing social problem is not for the judiciary to decide").

¶ 109    In support of this second claim, plaintiffs rely primarily on two Illinois Supreme Court cases: *Latham*, 31 Ill. 2d 178; and *Hoogasian v. Regional Transportation Authority*, 58 Ill. 2d 117 (1974).

¶ 110    In *Latham*, as in the case at bar, plaintiffs were Chicago residents and voters who claimed that the mayoral appointment of the Chicago School Board was unconstitutional. *Latham*, 31 Ill. 2d at 180. In *Latham*, plaintiffs made almost identical claims to the claims

_____

[22]Plaintiffs complain that, "[u]nlike other citizens, they are not entitled to raise the cap above 4 percent."

[23]Plaintiffs' appellate brief argues: "There is no finding that the 4 percent cap has any relation to the financial needs of the public schools twenty years later."

made here, which our supreme court rejected. The *Latham* plaintiffs claimed that appointment (1) denied them equal protection "because it deprive[d] them of the right to vote for members of the Board of Education which franchise is given residents of smaller districts" (*Latham*, 31 Ill. 2d at 185) and (2) led to taxation without representation (*Latham*, 31 Ill. 2d at 113).[24] In *Latham*, our supreme court rejected both of these claims, as we do here.

¶ 111    First, in rejecting the right to vote claim,[25] our supreme court explained that equal protection does not "prevent a State from adjusting its legislation to differences in situation and to that end to make a justifiable classification." *Latham*, 31 Ill. 2d at 185. " 'A statute which applies to one city, only, does not deny the equal protection of the laws where it is based on some real distinction between the particular city and the other territory of the State.' " *Latham*, 31 Ill. 2d at 186 (quoting *Weksler v. Collins*, 317 Ill. 132, 138 (1925)). Our supreme court found that Chicago was unique, with "far more complex" school issues than other districts (*Latham*, 31 Ill. 2d at 184), and that Illinois citizens had no "inherent right" to elections for school board members (*Latham*, 31 Ill. 2d at 186).

¶ 112    Although these findings were made decades ago, they still apply with equal force to the case at bar. Chicago is still a unique city in our state, and the 1970 Constitution, which

---

[24]Specifically, plaintiffs claimed that the Chicago School Board's taxing authority violated section 9 of article IX (Ill. Const. 1870, art. IX, § 9). of the version of the Illinois Constitution then in effect. *Latham*, 31 Ill. 2d at 180. Section 9 provided: "The general assembly may vest the corporate authorities of cities, towns and villages, with power to make local improvements by special assessment or by special taxation of contiguous property, or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes; but such taxes shall be uniform in respect to persons and property, within the jurisdiction of the body imposing the same." Ill. Const. 1870, art. IX, § 9. Then, as now, article IX was titled "Revenue." However, section 9 is no longer part of article IX. By contrast, our current constitution states that "school districts" shall have the "powers granted by law" by our legislature, which the 1870 Constitution did not state. Ill. Const. 1970, art. VII, § 8.

[25]The right to vote claim was count III in the *Latham* plaintiffs' complaint. *Latham*, 31 Ill. 2d at 185.

35

took effect after *Latham*, still does not provide an inherent right to school board elections. With respect to a school board election, a citizen's "right to vote therein is purely a permissive one bestowed by legislative grace in furtherance of the policy of the legislature." *Latham*, 31 Ill. 2d at 186; see also Ill. Const. 1970, art. VII, § 8 ("school districts" shall have the "powers granted by law").

¶ 113    In addition, the *Latham* plaintiffs claimed, as do plaintiffs here, that taxation "by the Board, whose members are appointed rather than elected, constitutes an unlawful exercise of the power to tax." *Latham*, 31 Ill. 2d at 180.[26] First, the supreme court disagreed with the plaintiffs' interpretation of the then-governing statute. *Latham*, 31 Ill. 2d at 180-81. The plaintiffs alleged that the statute gave the board complete control over setting taxes. *Latham*, 31 Ill. 2d at 180. Disagreeing with that allegation, the court observed that, under the then-governing statute, "not a penny of school taxes will be forthcoming without the adoption by the city council of an ordinance levying the tax." *Latham*, 31 Ill. 2d at 181-82. Plaintiffs in the case at bar repeat that quote, but all that quote establishes is that the state statute at that time was different from the present one and that the *Latham* court rejected plaintiffs' "factual allegations" concerning the board's power. *Latham*, 31 Ill. 2d at 182.

¶ 114    The *Latham* court went on to say that "[t]he legislature is mandated by the constitution of Illinois to establish a system of free schools for all" and "in furtherance of such legitimate legislative responsibilities the General Assembly may delegate to such agencies as it sees fit." *Latham*, 31 Ill. 2d at 186. The *Latham* court rejected the plaintiffs' taxation claim, "since the Board's functions and powers are expressly defined in article 34 [of the School Code], as are the maximum rates at which taxes may be levied." *Latham*, 31

_____

[26]The taxation claims in *Latham* were in counts I (*Latham*, 31 Ill. 2d at 180) and IV (*Latham*, 31 Ill. 2d at 186).

Ill. 2d at 187. Similarly, in the case at bar, the Board's functions and powers are still expressly defined by the legislature in article 34 of the School Code, as are the maximum rates at which taxes may be levied. As a result, we are no more persuaded by this claim than the *Latham* court was.

¶ 115     In support of their taxation claim, plaintiffs also cite *Hoogasian*. At issue in *Hoogasian* was an act passed by the legislature to create a regional transportation authority (RTA) in six counties, including Chicago and its suburbs. *Hoogasian*, 58 Ill. 2d at 120. The act required a referendum election[27] in the six counties in order to authorize the creation of the RTA. *Hoogasian*, 58 Ill. 2d at 120-21. After the referendum was held authorizing the RTA, the *Hoogasian* plaintiffs challenged the election and the act on numerous grounds, including a claim that the act granted the RTA "the unfettered right to levy taxies." *Hoogasian*, 58 Ill. 2d at 129-30. First, the supreme court observed that the legislature may constitutionally "authorize others to do things which it might properly do but cannot do as understandingly or as advantage[e]ously itself." *Hoogasian*, 58 Ill. 2d at 130.

¶ 116     Next the court listed the three taxes that the act authorized and observed that two of the taxes had a cap, which was "a rate not to exceed five percent of the gross receipts" from sales of motor fuel in the region. (Internal quotation marks omitted.) *Hoogasian*, 58 Ill. 2d at 130. However, with respect to the third tax, a " 'motor vehicle parking tax,' " there was absolutely no cap or standards. *Hoogasian*, 58 Ill. 2d at 130 (quoting Ill. Rev. Stat., 1973[28] Supp., ch. 111 ⅔, ¶ 704.03(d)). Subsection (d), which authorized the motor vehicle parking

---

[27]On this appeal, plaintiffs chose to contest the dismissal of counts I and II but not count III, which was their only count to ask for a referendum election. Thus, the issue of a referendum is not before this court.
[28]Although the *Hoogasian* opinion states that the statute appears in the 1973 supplement (*Hoogasian*, 58 Ill. 2d at 130), it is actually in the 1974 supplement.

tax, instructed the RTA to "provide for reasonable classifications in and exemptions to such tax," as well as "civil penalties and refunds," without any guidance as to what was reasonable. (Ill. Rev. Stat., 1974 Supp., ch. 111 ⅔, ¶ 704.03(d)). Despite the lack of any cap, standards, or guidance for this tax, the supreme court found that the act did not "improperly delegate legislative authority." *Hoogasian*, 58 Ill. 2d at 130, 132. By contrast, in the case at bar, where the legislature did provide a specific cap, for a specific purpose, we cannot find that it improperly delegated its legislative authority. Thus, the two cases upon which plaintiffs primarily rely, *Latham* and *Hoogasian*, do not support their claim that the legislature's delegation of taxing authority to the Chicago School Board violates due process.

¶ 117    For all the foregoing reasons, we do not find persuasive plaintiffs' second claim concerning taxation.

¶ 118                                    CONCLUSION

¶ 119    In conclusion, we affirm the trial court's dismissal of plaintiff's complaint with prejudice pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)). On this appeal, plaintiffs raised two claims: first, that they, as Chicago residents, had a fundamental right to directly elect school board members, since citizens of all other Illinois school districts had this ability; and second, that the Illinois General Assembly could not delegate the power to tax to a board that is not elected. For the foregoing reasons, we do not find these claims persuasive.

¶ 120    Affirmed.